# EXHIBIT 1

EXECUTION COPY

## RESTATED ORGANIZATION AND OPERATING AGREEMENT

This Restated Organization and Operating Agreement (this "Agreement"), dated as of March 31, 2004, is among Seneca Investments LLC (formerly known as Pegasus E-Services Investments LLC), a Delaware limited liability company (the "Company"), Omnicom Group Inc., a New York corporation ("Omnicom") and PGNT Management LLC, a Delaware limited liability company ("Management LLC" and, together with the Company and Omnicom the "Parties").

### RECITALS

A.      Omnicom, Pegasus E-Services Holdings LLC ("Holdings") and Pegasus Partners II, L.P. entered into the Organization and Operating Agreement, dated as of May 2, 2001 (the "LLC Agreement"), in connection with the formation of the Company.

B.      As of June 27, 2003, Holdings assigned all of its Common Stock in the Company to Management LLC and in connection therewith the LLC Agreement was amended to, among other things, reflect the admission of Management LLC as the sole holder of Common Stock of the Company.

C.      The Company and Omnicom have entered into a certain Exchange Agreement, dated as of March 31, 2004, whereby the Company shall issue to Omnicom (i) 16,666.66 shares of Common Stock which, upon issuance, will represent 40% percent of the issued and outstanding Common Stock on a fully diluted basis and (ii) a promissory note and security agreement (a "Senior Secured Note") in the principal amount of $24,000,000 in favor of Omnicom, all in exchange for the tender of and exchange by Omnicom of the preferred stock then held by it.

D.      The effectiveness of the Exchange Agreement is conditioned upon the Parties agreement to restate the LLC Agreement (and the Charter of the Company attached thereto as Exhibit A and incorporated therein) upon the terms and conditions contained herein.

F.      Certain terms used herein with initial capital letters have the meanings specified below.

Now, therefore, in consideration of the foregoing and the mutual covenants and agreements hereinafter set forth, the Parties hereto agree as follows.

## I.      ORGANIZATIONAL MATTERS

1.1. Formation; Name: The Company was formed as a limited liability company under the laws of the State of Delaware on April 20, 2001 by the filing with the Secretary of State of Delaware of the Certificate of Formation (as such certificate may be amended from time to time, the "Certificate") in the name of Pegasus E-Services Investments LLC and such name was changed by the filing of a Certificate of Amendment on May 3, 2001.

#441755v9 05346-0001-040

GN 0385

1.2. **Governance as if a Delaware Corporation:** Except as otherwise expressly set forth in the Constituent Documents or as required by law, the Company will be governed in all respects as if it were a corporation organized under and governed by the Delaware General Corporation Law (the "DGCL"), and the rights of its Stockholders will be governed by the DGCL and the applicable Constituent Documents, which will be interpreted as if the Company had been a corporation incorporated under the DGCL and its Stockholders were stockholders of such a corporation. Notwithstanding the foregoing:

(a)     Except as required by the Act, neither the Charter, any amendments thereto nor any other instrument (other than the Certificate) will be required to be filed with the Secretary of State of the State of Delaware pursuant to Sections 101, 103, 105, 106, 241 or 242 of the DGCL (any such document which would otherwise be so required to be filed with the Secretary of State of the State of Delaware will be filed with the Secretary of the Company);

(b)     All taxes and fees otherwise payable by the Company pursuant to Section 391 of the DGCL will be determined under and payable solely in accordance with the Act;

(c)     Directors, officers, controlling Persons (if any) and direct and indirect holders of Common Stock of the Company (collectively, "Stockholder's Persons") will not have any duty, fiduciary or otherwise, to any entity comprising the Company Group, other stockholders or any other Person or any of each of their respective Affiliates. Stockholder's Persons will not be personally liable to any entity comprising the Company Group, other stockholders or any other Person for any actual or alleged action or inaction taken or not taken on behalf of any entity comprising the Company Group, except for losses that resulted directly and solely from (1) the intentional breach of the Constituent Documents or (2) an action that a court of competent jurisdiction finally determines in an order or opinion not subject to further appeal constituted an intentional and willful violation of law and, in any such case, the Stockholder's Person will be obligated only to return or repay the actual pecuniary benefit it wrongfully received and will not be liable for any consequential, punitive or other damages; and

(d)     Notwithstanding any other provision hereof, neither the Company nor any other Person will be subject to the provisions of DGCL Sections 102(b)(7), 144, 145, 154, 160(a), 170, 172, 173, 174, 203 or 282.

Notwithstanding anything contained herein, the Company, and each entity comprising a part of the Company Group in which the Company has a direct or indirect interest, will make all necessary elections to be treated as a partnership (or entity disregarded as separate from its owners) for federal income tax purposes. The preceding sentence does not apply to any issuer to the extent it is presently treated as a corporation for federal income tax purposes

1.3. **Competitive Activities, Etc.:**

(a)     The direct or indirect stockholders, directors and officers of the Company, directly or through Affiliated entities, are or may be engaged in businesses which may be

#4-41755v9 05346-0001-040                    2

competitive with the business of the Company or companies it owns or in which it invests. Nothing herein, in the Act, the DGCL, any Constituent Document or otherwise (collectively, the "Applicable Rules") will be deemed to restrict any such direct or indirect stockholder, director, officer or Affiliate of the Company (collectively, "Company Persons") from engaging in such other business activity (regardless of the effects thereof on the Company or companies it owns or in which it invests) and, notwithstanding any Applicable Rule to the contrary, in no event will any Company Person have any obligation to act or refrain from acting (including without limitation presenting any opportunity or other matter to the Company for it to consider or pursue or to maintain the confidentiality of, or not use, any confidential or proprietary information) by reason of any relationship with, or actual or alleged duty to, the Company. Each Party agrees that, in any such case, to the extent a court might otherwise hold that the conduct of such activity is a breach of any Applicable Rule, it has hereby irrevocably waived any and all rights of recovery it may otherwise have by reason thereof.

(b)     Without limiting the generality or effect of any other provision hereof, Omnicom, directly or through Affiliates, may have and may in the future have commercial relationships with or engage in commercial transactions involving one or more of companies owned by the Company or in which the Company invests. Neither Omnicom nor any of its Affiliates will have any liability to the Company or any Company Person or member of the Company Group by reason thereof, whether directly or through one or more of the companies owned by the Company or in which the Company invests, on any theory whatsoever; provided, however, that this limitation will not affect any contractual obligations that Omnicom or any of its Affiliates may have.

1.4. **Liability to Third Parties:** Except as otherwise set forth in this Agreement and/or the other Transaction Documents, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, will be solely its debts, obligations and liabilities and none of its Company Persons will be personally obligated for any such debt, obligation or liability or any debt, obligation or liability of any entity comprising the Company Group or to any companies owned by the Company or in which the Company invests. Except as set forth in this Agreement, no Stockholder's Persons shall be (i) liable for any debts, obligations, liabilities whether arising in contract, tort or otherwise of any other Company Person or (ii) required to loan any funds to the Company.

1.5. **Powers:** The Company will possess and may exercise all of the powers and privileges granted by the Act, the DGCL (assuming that the Company were a corporation), any other law or this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of its permitted business purposes or activities.

1.6. **Directors and Officers:** The composition of the Board will be as specified on Schedule 1.6.

#441755v9 05346-0001-040                    3

## II.    CAPITALIZATION; DISTRIBUTIONS; FEES; CLOSING

### 2.1. Capitalization, Distributions, Fees, Etc.:

(a)    **Stockholders:**    Effective as of the date hereof, Omnicom and Management LLC are the Stockholders and will be shown as such on the Company's books and records as the owners of the shares of Capital Stock of the Company as set forth on Schedule 2.1. No other Person will be a stockholder of the Company, and no Capital Stock of the Company will be issued, without compliance with the terms and provisions of its Constituent Documents and the execution by any such Person of a joinder to this Agreement whereby such Person agrees to be bound by this Agreement and the other Constituent Documents.

(b)    **Distributions, Etc.: Distributions, Etc.:** Allocations of Net Profits and Net Loss (as those terms are defined in Exhibit C) will be as provided in Exhibit C. Subject to the making of Tax Distributions, distributions will be made as provided in Section 2.2 below. Each Party represents and warrants that it is aware of the income tax consequences of such allocations and hereby agrees to be bound by Exhibit C in reporting its share of such Net Profits and Net Loss for income tax purposes. Notwithstanding anything to the contrary in the foregoing, if any Stockholder (or in the case of any pass-through entity or Stockholder of a consolidated group, any Stockholder of a Stockholder or consolidated group of which a Stockholder is a part) has had cumulative Final Tax Liability over the life of the Company but only through the date to which the Final Tax Liability was determined directly attributable to its ownership (as opposed to its disposition) of an interest in the Company (and which tax liability such Stockholder would not have had but for such ownership) in excess of cash distributions made to such Stockholder over the life of the Company but only through the date to which the Final Tax Liability was determined, the Company shall in the Fiscal Year in which there is a Final Tax Liability distribute to such Stockholder as a Tax Distribution the amount of any such excess. "Final Tax Liability" shall be the sum of (i) the Tax Liability as defined in paragraph (c) below, plus (ii) any additional tax liability (including applicable penalties and interest and the reasonable cost of accountants and attorneys fees relating to that portion of any audit giving rise to such tax liability) asserted on audit which assertion has been upheld by the final level of administrative appeals at the Internal Revenue Service which is in excess of the amount specified in clause (i) above (such specified amount being the "Clause (i) Amount")(provided that at any time a compromise may be reached earlier if, and only if, in all cases, the reasonable consent of each of the other Stockholders of the Company has been given in writing to such compromise or failure to appeal) less (iii) any correlative downward adjustments in the Clause (i) Amount for any prior Fiscal Year implied by the upheld assertion referred to in clause (ii), above; ((the foregoing distribution being a "Tax Distribution"). Notwithstanding anything to the contrary in this Agreement, if any distribution in respect of a Final Tax Liability is made, such amount shall be offset dollar for dollar from any future distributions that otherwise would have been made to the Stockholder receiving such Tax Distribution but only to the extent such distribution would exceed such Stockholder's Tax Liability for the Fiscal Year in respect of which such distribution is to be made. Notwithstanding anything to the contrary in the foregoing, the costs incurred in connection with any proceeding beyond

GN 0388

the final level of administrative appeals of the Internal Revenue Service shall not constitute a part of the Final Tax Liability, unless consented to in advance in writing by the other Stockholders. Such distribution shall be paid with respect to a Fiscal Year of the Company within 90 days after the end of such Fiscal Year, or at such earlier times and in such amounts as determined in good faith by the Board. The amount of any other distributions that would otherwise be made in respect of a Fiscal Year for which a Tax Distribution is made, or in respect of any later Fiscal Year, shall be computed by treating the Tax Distribution as if it had been part of such other distribution or distributions. Tax Distributions to any Stockholder shall be taken into account in the making of any distributions in Section 2.2 below.

(c)  For purposes of paragraph (b), "Tax Liability" means the amount determined by applying hypothetical income tax rate determined for each Fiscal Year of the Company by the Board to be the highest marginal combined effective federal, state and local income tax rate in respect of items of income and gain, net of items of loss and deduction in fact allocated by the Company to a Stockholder (or its owners) for such Fiscal Year and taking into account the character of the items of income allocated provided that any items of loss or deduction passed through in prior Fiscal Years to a Stockholder in excess of items of income or gain passed through in such year (and not previously used to reduce a later year Tax Distribution under this Section) shall be treated as if they were items of loss and deduction so passed through for such current Fiscal Year applied to the taxable income of such Stockholder for the tax year. Tax Distributions to any Stockholder shall be taken into account in the making of any distributions in Section 2.2 below.

2.2.   Distributions of available cash for any Fiscal Year shall be made to the Stockholders in accordance with the number of Common Shares held by each.

## III.   GENERAL

3.1. **Amendments, Waivers and Consents:**  No amendment to this Agreement or the Company's Constituent Documents may be made without the written consent of each of the Stockholders.

3.2. **Governing Law:**  This Agreement will be deemed to be a contract made under, and will be construed in accordance with, the laws of the State of Delaware without giving effect to conflict of laws principles thereof.

3.3. **Notices and Demands:**  Any notice or demand which is required or permitted to be given under this Agreement must be given, and will be deemed to have been sufficiently given for all purposes of this Agreement, on the date delivered by hand or distributed by fax or e-mail prior to 5:00 p.m., Eastern Standard Time (otherwise, such notice will be deemed received on the next succeeding business day in the place of receipt), or the next business day after being sent by overnight delivery by a reputable overnight courier service providing receipt of delivery, to the principal executive offices of such Person.

GN 0389

**3.4. Integration:** This Agreement, including the Exhibits and Schedules referred to herein or therein or attached thereto (each of which is a part of this Agreement), constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof, including, without limitation, the LLC Agreement and all exhibits and schedules thereto.

**3.5. Assignability; Binding Agreement:** This Agreement may not be assigned, in whole or in part, by any Party, nor may any obligation hereunder be delegated to a third party, in either case without the prior written consent of the other Parties. This Agreement will be binding upon and enforceable by, and will inure to the benefit of, the Parties and their respective successors, heirs, executors, administrators and permitted assigns, and no others.

**3.6. Termination:** This Agreement will terminate upon the dissolution of the Company pursuant to the Charter or may be terminated at any time by the mutual consent of the Stockholders.

**3.7. Counterparts:** This Agreement may be executed simultaneously in two or more counterparts (including facsimile copies), any one of which need not contain the signatures of more than one Party, but all such counterparts taken together will constitute one and the same Agreement.

**3.8. Jurisdiction:**

(a)    Each Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the New York state court located in the Borough of Manhattan, City of New York or the United States District for the Southern District of New York (as applicable, a "New York Court"), and any appellate court from any such court, in any suit, action or proceeding arising out of or relating to the subject matter hereof, or for recognition or enforcement of any judgment resulting from any such suit, action or proceeding, and each Party hereby irrevocably and unconditionally agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in the New York Court.

(b)    It will be a condition precedent to each Party's right to bring any such suit, action or proceeding that such suit, action or proceeding, in the first instance, be brought in the New York Court (unless such suit, action or proceeding is brought solely to obtain discovery or to enforce a judgment), and if each such court refuses to accept jurisdiction with respect thereto, such suit, action or proceeding may be brought in any other court with jurisdiction.

(c)    No Party may move to (i) transfer any such suit, action or proceeding from the New York Court to another jurisdiction, (ii) consolidate any such suit, action or proceeding brought in the New York Court with a suit, action or proceeding in another jurisdiction unless such motion seeks solely and exclusively to consolidate such suit, action or proceeding in the New York Court, or (iii) dismiss any such suit, action or proceeding brought in the New York Court for the purpose of bringing or defending the same in another jurisdiction.

GN 0390

(d)    Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in the New York Court, (ii) the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in the New York Court, and (iii) the right to object, with respect to such suit, action or proceeding, that such court does not have jurisdiction over such Party. Each Party irrevocably consents to service of process in any manner permitted by law.

3.9. **WAIVER OF JURY TRIAL:**    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THE SUBJECT MATTER HEREOF OR THE TRANSACTIONS CONTEMPLATED HEREBY.

3.10. **No Strict Construction:**    The Parties hereto have participated jointly in the preparation of the Transaction Documents.  In the event an ambiguity or question of intent or interpretation arises, any provision contained herein will be construed as if drafted jointly by the Parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any such provisions.

3.11. **Certain Other Interpretive Matters:**

(a)    Titles and headings to Sections herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

(b)    Unless the context otherwise requires, (i) all references to Articles, Sections or Schedules are to Articles, Sections or Schedules of this Agreement, (ii) each term defined in this Agreement has the meaning assigned to it, and (iii) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP.  All references to "$" or dollar amounts are references to lawful currency of the United States of America.

3.12. **Expenses:** Except as otherwise provided herein, each party hereto shall pay and be responsible for all expenses and fees that it may incur in preparation for the consummation of the transactions contemplated hereby.

3.13. **Definitions:** For purposes of this Agreement, in addition to the terms defined elsewhere herein, the following terms have the following meanings when used herein with initial capital letters:

"Affiliate" of a Person means (i) with respect to an individual, any member of such person's family, (ii) with respect to an entity, any officer, director, direct or indirect shareholder, partner or permitted transferee in such entity or of or in any affiliate of such entity, and (iii) with respect to an individual or entity, any Person or entity which directly or indirectly controls, is controlled by, or is under common control with (within the meaning of either Section

GN 0391

15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended) such Person or entity.

"Board" means the Company's Board of Directors.

"Bylaws" means the Company's bylaws, attached as Exhibit B.

"Capital Stock" includes all equity interests of any Person, including common stock, preferred stock, membership interests, partnership interests and all other equity interests of any kind.

"Charter" means the Company's charter, attached hereto as Exhibit A.

"Common Shares" means shares of Common Stock.

"Common Stock" means membership interests of the Company issued pursuant to its Constituent Documents which will be designated as "common stock" for purposes thereof.

"Company" means Seneca Investments LLC.

"Company Group" means the Company and any Subsidiary.

"Constituent Documents" of an entity means the entity's certificate of incorporation or formation, operating agreement, charter, bylaws and other documents pursuant to which the entity was legally formed, as amended, and, as applied to the Company, this Agreement and the Charter, Bylaws, and Exhibits C.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or any unincorporated organization.

"Stockholder" means a holder of Capital Stock of the Company

"Subsidiary" means any Person in which the Company, directly or indirectly, through subsidiaries or otherwise, beneficially owns or controls fifty percent or more of either the equity interests in, or the voting control of, such Person.

*[Signature page follows]*

#441755v9 05346-0001-040                    8

GN 0392

IN WITNESS WHEREOF, the parties have executed this Restated Organization and Operating Agreement as of the date first above written.

OMNICOM GROUP INC.

By: _____
Name:
Title:


PGNT MANAGEMENT LLC


By: _____
Name:
Title:

#441755v7 05346-0001-040

IN WITNESS WHEREOF, the parties have executed this Restated Organization and Operating Agreement as of the date first above written.

OMNICOM GROUP INC.

By:_____
Name:
Title:


PGNT MANAGEMENT LLC

By:_____
Name:
Title:

#441755v7 05346-0001-040

**EXHIBITS**

Charter of the Company...................................................................................... A
Bylaws of the Company...................................................................................... B
Tax Matters ...................................................................................................... C

**SCHEDULES**

Directors and Officers....................................................................................... 1.6
Stockholders ..................................................................................................... 2.1

#441755v9 05346-0001-040

Schedule 1.6

**DIRECTORS AND OFFICERS**

| Person | Office |
|---|---|
| Michael Tierney | Director & Chief Executive Officer |
| Gerard Neumann | Director, Vice President, Chief Financial Officer, Treasurer & Secretary |
| Dara Akbarian | Director |

#441755v9 05346-0001-040

GN 0396

Schedule 2.1

STOCKHOLDERS

PGNT Management LLC — 25,000 shares of Common Stock

Omnicom Group Inc. — 16,666.66 shares of Common Stock

#441755v9 05346-0001-040

GN 0397

Exhibit A

## RESTATED CHARTER
## OF
## SENECA INVESTMENTS LLC

Pursuant to the Restated Organization and Operating Agreement, dated as of March 31, 2004 (the "Restated LLC Agreement"), the Charter of Seneca Investments LLC (the "Company") is as follows:

1. **Name of the Company:** The name of the company is SENECA INVESTMENTS LLC (the "Company").

2. **Registered Office; Agent; Place of Business:** The registered office and registered agent of the Company in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Wilmington, Delaware 19808. The principal place of business of the Company shall be at such address or such other place within the New York City metropolitan area as the Board of Directors of the Company (the "Board") may determine.

3. **Purpose:** As provided in the Restated LLC Agreement, the purpose of the Company is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law (the "DGCL").

4. **Duration:** The Company will exist until the tenth anniversary of the LLC Agreement unless earlier dissolved.

5. **Authorized Capital Stock:** The total authorized capital stock of the Company is 41,666.66 shares, no par value, which shall be designated "Common Stock."

6. **Designations, Powers, Preferences, Etc. of Common Stock:**   All shares of Common Stock will be identical and will entitle the holders thereof to the same rights and privileges.

    (a)    **Voting Generally:** The holders of the Common Stock will possess all voting power. Each holder of Common Stock will be entitled to one vote for each share held on all matters submitted to Stockholders of the Company, whether by vote at a meeting or for action by written consent, and holders of Common Stock will vote together as a single class on all matters submitted to Stockholders of the Company.

    (b)    **Election of Directors:** Subject to the provisions of this paragraph 6(b), the holders of outstanding shares of Common Stock will, voting together as a single class, be entitled to elect all of the members of the Board; provided that such holders of Common Stock shall elect to the Board one member designated by Omnicom (the "Omnicom Director"). The election of each Director by the holders of Common Stock will occur (i) at the annual meeting of holders of Capital Stock, (ii) at any special meeting

#441758v7 05346-0001-040

of holders of Capital Stock, or (iii) by the written consent of holders of a majority of the voting power of the outstanding shares of Common Stock. Notwithstanding the foregoing, the holders of a majority of the outstanding shares of Common Stock may, in their sole discretion, remove any Director at any time, with or without cause; provided, however, removal of the Omnicom Director may only occur upon written request by Omnicom. Subject to the rights of Stockholders provided in the Constituent Documents and applicable provisions of the DGCL and the Act, the Board will have the power to direct the oversight of the management of the Company.

(c)    **Certain Actions:** Unless a higher percentage may be required by law or the Constituent Documents (including as may addressed herein), any action required to be approved by Stockholders may be so approved by a majority vote of the holders of the outstanding shares of stock of the class entitled to vote on the matter.

(d)    **Voting Rights:** So long as any outstanding shares of Common Stock are held by Omnicom, notwithstanding any provision in any other Constituent Document, the Company will not, without first having obtained Omnicom's prior written consent:

(i)    create, obligate itself to create, authorize or issue any Capital Stock of the Company (or reclassification of any existing Capital Stock) or securities exercisable for or convertible or exchangeable into Capital Stock of the Company;

(ii)    create any bonds, notes or other obligations convertible into, exchangeable for or having option rights to purchase shares of Capital Stock;

(iii)    create any new Subsidiaries or Affiliates of the Company that would adversely affect the Common Stock;

(iv)    assign, sell, lease, contribute or otherwise dispose of or transfer whether by sale, license, merger, consolidation, liquidation, dissolution or otherwise, any of the Company's material assets for less than fair market value;

(v)    enter into any transaction with any related party of Management LLC or any of its Affiliates;

(vi)    agree to a merger, sale or consolidation of the Company with or into another entity or the effectuation of any transaction or series of related transactions in which more than 20% of the voting power of the Company is disposed;

(vii)    apply for or consent to the appointment of a receiver, trustee, administrator, manager or liquidator of the Company or any of its property or file a voluntary petition in bankruptcy or an answer admitting the material allegations of an involuntary petition filed against the Company;

(viii)    convert the Company into a corporation pursuant to Section 265 of the DGCL;

GN 0399

(ix)    pay or distribute funds, assets or securities to Stockholders, directors, officers, key management employees or any persons controlling, controlled by, under common control with or otherwise affiliated with, or a member of a family of, any such person, except (A) payments pursuant to that certain Management Agreement dated as of the date hereof between the Company and Management LLC (the "Management Agreement") and (B) payments of accrued expenses reflected on the Balance Sheet of the Company as of March 31, 2004, as amended by the Final Closing Balance Sheet (as defined in the Exchange Agreement dated as of the date hereof, between the Company and Omnicom);

(x)    apply any of the Company's assets to the redemption or acquisition of any shares of Common Stock;

(xi)    make any material change in the Company's capital structure, including acquisitions and dispositions of assets greater than 20% of the fair value of the Company's total assets, which would adversely affect the Common Stock;

(xii)    except as required by law, take any action that would cause the Company not to be treated as a "partnership" for federal or state tax purposes or that would materially adversely affect the tax position of Omnicom;

(xiii)    amend (or waive any provision of) any Constituent Document (including any exhibit thereto) that would adversely affect the Common Stock; and

(xiv)    cause or permit any of the Company's Subsidiaries to take or agree to take any of the actions set forth above.

(e)    **Information Rights:**  So long as any outstanding shares of Common Stock are held by Omnicom, the Company will supply Omnicom reasonable access on a timely basis to financials, records and accountants of the Company, including without limitation information requested by Omnicom for tax or financial accounting purposes and all reports and notices given to members of the Board.

7. **Notice:**  In the event the Company establishes a record date to determine the holders of any class of securities who are entitled to receive any dividend or other distribution or who are entitled to vote at a meeting (or by written consent) or whose shares of Capital Stock are to be redeemed (either voluntarily or as a result of any action by the Company or otherwise that would result in a right of redemption) in accordance with the provisions of this Charter, the Company will give notice in the manner specified in the LLC Agreement to each holder of Capital Stock at least ten days prior to such record date specified therein or the expected effective date of any such event or transaction, whichever is earlier, specifying (i) the date of such record date, (ii) the date on which any event or transaction is expected to become effective, and (iii) the date on which the books of the Company will close or a record will be taken with respect to any such event.

8. **No Reissuance of Capital Stock:**  No share or shares of Capital Stock acquired by the Company by reason of redemption, purchase, conversion or otherwise may be reissued, and all

3

GN 0400

such shares will be canceled, retired and eliminated from the shares which the Company will be authorized to issue.

9. **Contractual Rights of Holders:** The various provisions set forth herein for the benefit of the holders of the Capital Stock will be deemed contract rights enforceable by them, including without limitation one or more actions for specific performance, subject to the LLC Agreement.

10. **Severability of Provisions:** If any voting powers or other special rights of the Common Stock and qualifications, limitations and restrictions thereof set forth in this Charter are invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other voting powers and other special rights of the Common Stock and qualifications, limitations and restrictions thereof set forth in this Charter which can be given effect without the invalid, unlawful or unenforceable voting powers and other special rights of the Common Stock and qualifications, limitations and restrictions thereof will nevertheless remain in full force and effect, and no voting powers or other special rights of the Common Stock or and qualifications, limitations and restrictions thereof herein set forth will be deemed dependent upon any other such voting powers or other special rights of the Common Stock and qualifications, limitations and restrictions thereof unless so expressed herein.

11. **Indemnification; Duties:** The Company will, to the fullest extent permitted or required by law, as from time to time amended and supplemented, indemnify any direct or indirect stockholder, director, officer or Affiliate of the Company from and against any and all of the expenses, liabilities, costs or other matters to the extent the same arose from or related directly or indirectly to the conduct of the business or affairs of the Company (other than with respect to a Non-Indemnifiable Loss of such Person), and the indemnification provided for herein will not be deemed exclusive of any other rights to which those indemnified may be entitled under any bylaw, agreement, vote of the Stockholders or disinterested directors or otherwise, both as to any action in an official capacity and as to action in another capacity while holding such office, and will continue as to a person who has ceased to be director, officer, employee or agent and will inure to the benefit of the heirs, executors and administrators of such person. Any repeal or modification of this Section 11 will not adversely affect any right or protection existing hereunder immediately prior to such repeal or modification. "Affiliate" of a Person means (i) with respect to an individual, any member of such person's family, (ii) with respect to an entity, any officer, director, direct or indirect shareholder, partner or permitted transferee in such entity or of or in any affiliate of such entity, and (iii) with respect to an individual or entity, any Person or entity which directly or indirectly controls, is controlled by, or is under common control with (within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended) such Person or entity.

12. **DGCL Opt Outs:** The Company hereby elects not to be governed by Sections 102(b)(7), 144, 145, 160(a), 170, 172, 173, 174, 203 and 282 of the DGCL as from time to time in effect or any successor provision thereto.

4

#441758v7 05346-0001-040

GN 0401

13. **Number of Directors:** The initial number of directors shall be three (including the Omnicom Director), and will not be increased or decreased without the affirmative vote of the Omnicom Director.

14. **Election of Directors:** Election of directors at an annual or special meeting of Stockholders need not be by written ballot unless the Bylaws so provide.

15. **Amendments:** The Company may amend the Charter or its Bylaws in the manner provided in the LLC Agreement.

16. **Transfer Restrictions; Restriction Period:**

(a)    No holder of Common Stock shall Transfer, except to Permitted Transferees, all or any portion of the Common Stock now owned or hereinafter acquired by such holder except in compliance with Section 16(c) below. For purposes of this Section 16, "Transfer" means any direct or indirect offer, transfer, donation, sale, assignment, conveyance, encumbrance, mortgage, gift, pledge, hypothecation, grant of a security interest in or other disposal or attempted disposal of all or any portion of a security or of any rights connected thereto or interests therein, with or without consideration, whether voluntary or involuntary, including but not limited to, any Transfer by operation of law, by court order, by judicial process or by foreclosure, levy or attachment.

(b)    **Permitted Transferees:** Nothing herein will prohibit the Transfer of Capital Stock to (i) another holder of Capital Stock, (ii) the Company (if such transfer is otherwise permitted under the Constituent Documents), or (iii) wholly owned subsidiaries of the holders of Capital Stock provided that such subsidiary enters into a joinder to the LLC Agreement (as described in Section 2.1(a) thereof) simultaneously with or prior to the transfer ("Permitted Transferees"). Notwithstanding the foregoing, with respect to Management LLC, Permitted Transferees shall include Michael Tierney and Gerard Neumann, provided that each such individual transferee enters into a joinder to the LLC Agreement (as described in Section 2.1(a) thereof) simultaneously with or prior to the transfer.

(c)    **Right of First Refusal:**

(i)    **Notice of Offer:** Subject to Sections 16(a), (b) and (d), if any holder of Common Stock receives a bona fide offer for any or all of the Common Stock then owned by such holder (the "Selling Holder") that the Selling Holder intends to accept, the Selling Holder shall deliver a written notice (a "Notice of Offer") to the other holders of Common Stock (the "Remaining Holders") at least 30 days in advance of such proposed sale. The Notice of Offer shall describe in reasonable detail the shares of Common Stock being offered (the "Subject Shares"), the purchase price for the sale of the Subject Shares (the "Target Price") and all other material terms and conditions of the offer.

GN 0402

(ii)    **Offer Period:** Each Remaining Holder shall have the option to purchase all or a portion of the Subject Shares at the Target Price (except that if the Target Price includes consideration other than cash, the Target Price shall be reduced to its cash equivalent as reasonably determined by the Company's accountants) (the "Right of First Refusal"). The Right of First Refusal shall be exercisable by written notice to the Selling Holder delivered within 30 days after the delivery of the Notice of Offer (the "Offer Period"). If the Right of First Refusal is exercised by more than one Remaining Holder, the percentage of the Subject Shares that may be purchased by each such Remaining Holder shall be determined by dividing the number of shares of Common Stock owned by each such Remaining Holder by the total number of shares of Common Stock owned by all Remaining Holders who elect to exercise the Right of First Refusal, without reference to the shares of Common Stock held by any Remaining Holders who elect not to purchase any Subject Shares. In the event that any Remaining Holder does not fully subscribe for its proportionate share of the Subject Shares, each fully participating Remaining Holder shall have an option to purchase that percentage of such unsubscribed Subject Shares determined by dividing the number of shares of Common Stock owned by such fully participating Remaining Holder by the total number of shares of Common Stock owned by all fully participating Remaining Holders.

(iii)    **Contract with Proposed Purchaser:** If any Selling Holder has given the Remaining Holders a Notice of Offer and the Remaining Holders, collectively, have failed to exercise their right to purchase all of the Subject Shares pursuant to subsection (ii) above, the Selling Holder may, within ninety (90) days after the end of the Offer Period, execute a contract with a third party (the "Proposed Purchaser") providing for the bona fide sale of the unsold Subject Shares at or above the Target Price and on terms no less favorable than those contained in the Notice of Offer (the "Purchase Contract"). The Purchase Contract shall expressly provide for the rights of each holder of Common Stock under this Section 16. Within 10 days after the execution of the Purchase Contract, the Selling Holder shall deliver a written notice of such Purchase Contract (a "Notice of Proposed Transfer") to the Remaining Holders together with a copy of the Purchase Contract. Such Notice of Proposed Transfer will also include the name of the Proposed Purchaser and a statement of the material relationships, if any, between the Selling Holder and the Proposed Purchaser. If the Proposed Purchaser is not an individual, the Selling Holder shall use its best efforts to include in the Notice of Proposed Transfer a brief description of the business of the Proposed Purchaser.

(d)    **Publicly Traded Partnership:** Notwithstanding anything contained herein, no transfers shall be permitted or recognized by the Company if any such transfer could cause the Company to be treated as a "publicly traded partnership" for purposes of Section 7704 of the Internal Revenue Code.

### 17.  Dissolution: Company Liquidating Events:

(a)    The Company will dissolve and commence winding up and liquidating upon the occurrence of any Company Liquidating Event. The Company will not dissolve prior to the occurrence of any Company Liquidating Event. "Company Liquidating Event" means any of the following events:

6

GN 0403

(i)      the voluntary or involuntary bankruptcy of the Company;

(ii)      the happening of any event that makes it unlawful or impossible to carry on the business of the Company, or the Delaware Court of Chancery has entered a final decree pursuant to Section 18-802 of the Act;

(iii)      the adoption of a plan of liquidation in accordance with the requirements of Sections 275(a) and (b) of the DGCL; and

(iv)      sale or other disposition of all of the assets of the Company, unless otherwise agreed by the parties.

For the avoidance of doubt, the occurrence of any event described in Section 18-801(a)(4) of the Act with respect to the holders of Capital Stock will not be a Company Liquidating Event.

(b)      **Distribution of Assets:** Upon the occurrence of a Company Liquidating Event, the Company will continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and the holders of Capital Stock, and the Board will not take any action with respect to the Company that is inconsistent with the winding up of the Company's business and affairs. The Board will be responsible for overseeing the winding up and dissolution of the Company, will take full account of the Company's assets and liabilities, and will cause the Company's assets or the proceeds from the sale or disposition thereof, to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(i)      first, as provided in Section 18-804(a)(1) of the Act; and

(ii)      to the extent not covered under clause (i) above, all indebtedness, liabilities and obligations owed to Omnicom or its Affiliates; and

(iii)      thereafter, in accordance with Section 2.2 of the Operating Agreement.

(c)      **Notice of Dissolution:** The Company will promptly notify the holders of Capital Stock of any Company Liquidating Event.

(d)      **Certificate of Cancellation:** In accordance with the Act, as soon as possible following the occurrence of any of the events specified in Section 18(a) effecting the dissolution of the Company, the Board will cause to be executed and filed a certificate of cancellation with the Secretary of State of the State of Delaware in such form as is prescribed by the Secretary of State of the State of Delaware.

18.  **Interpretation:** In the event of an inconsistency between this Charter or the Bylaws and the LLC Agreement, the LLC Agreement will prevail. In addition to the terms defined in the Charter, terms used herein which are defined in the LLC Agreement are used herein as so defined.

#441758v7 05346-0001-040

7

GN 0404

19. **Additional Separateness Covenants:** Notwithstanding any provision herein or in the other Constituent Documents to the contrary, the Company (in order to preserve its separate and distinct identity) will:

      (a)     Maintain its books, records and bank accounts separate from those of any other person or entity;

      (b)     Hold all of its assets in its own name and not commingle its assets with those of any other person or entity;

      (c)     Conduct its business in its name;

      (d)     Maintain financial statements showing its assets and liabilities separate and apart from those of any other person or entity and not list its assets on the financial statements of any other person or entity;

      (e)     Pay its liabilities and expenses, including salaries of any employees, only out of its funds;

      (f)     Observe all limited liability company and other organizational formalities;

      (g)     Maintain an arm's-length relationship with other persons and entities and enter into transactions with other persons and entities only on a commercially reasonable basis;

      (h)     Maintain a sufficient number of employees in light of its contemplated business operations or otherwise provide for management and administration of its operations;

      (i)     Not hold out its credit as being available to satisfy the obligations of other persons or entities, not pledge its assets for the benefit of other persons or entities and, in general, hold itself out as a separate entity and correct any known misunderstanding regarding its separate identity;

      (j)     Not acquire the obligations or securities of other persons or entities, guarantee or become obligated for the debts of other persons or entities or make loans to other persons or entities or buy or hold any evidence of indebtedness issued by other persons or entities;

      (k)     Allocate fairly and reasonably any overhead expenses that are shared with any other person or entity, including paying for office space and services provided to the Company by any other person or entity;

      (l)     Other than as may be necessary for Management LLC to provide services under the Management Agreement, use separate stationery, invoices, checks and other business forms bearing the Company's name and not the name of any other person or

8

#441758v7 05346-0001-040

GN 0405

entity; not use a mailing address, e-mail address or telephone number of any other person or entity; and not identify itself as a division of any other person or entity; and

    (m)    Maintain adequate capital in light of its contemplated business operations.

For purposes hereof, (1) direct or indirect Subsidiaries of the Company and (2) other entities in which the Company has an equity interest will not be considered an "other person or entity" unless, in the case of clause (2), any direct or indirect stockholders of the Company or such stockholders' direct or indirect subsidiaries (other than the Company and its direct or indirect Subsidiaries) also have an equity interest in such entity.

20. **Unanimous Approval for Certain Actions:** The Company will not take any "Bankruptcy Action" without the unanimous and affirmative vote or consent of the holders of all of its Common Stock. "Bankruptcy Action" means any of the following:

    (a)    Taking any action that would render the Company insolvent immediately after the taking of such action;

    (b)    Commencing any case, proceeding or other action on behalf of the Company, or otherwise seeking any relief, under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief from debts or the protection of debtors generally;

    (c)    Filing a petition or consenting to a petition seeking reorganization, arrangement, adjustment, winding-up, composition or other relief on behalf of the Company of its debts under any federal or state law relating to bankruptcy, or consenting to the institution of bankruptcy or insolvency proceedings against the Company;

    (d)    Seeking or consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for the Company or a material portion of the Company's assets;

    (e)    Making any assignment for the benefit of the Company's creditors; and

    (f)    Taking any action that is reasonably likely to result in any of the foregoing.

9

#441758v7 05346-0001-040

GN 0407

## SENECA INVESTMENTS LLC

## BY-LAWS

### STOCKHOLDERS' MEETINGS

1.  *Time and Place of Meetings:*  All meetings of the stockholders for the election of Directors or for any other purpose will be held at such time and place as may be designated by the Board or, in the absence of a designation by the Board, the Chief Executive Officer, the Chairman, the President or a Vice Chairman and stated in the notice of meeting. The Board, the Chief Executive Officer, the Chairman, or a Vice Chairman may postpone any previously scheduled annual or special meeting of the stockholders.

2.  *Annual Meeting:*  An annual meeting of the stockholders will be held at such date and time as may be designated from time to time by the Board, at which meeting the stockholders will elect, by a vote of the holders of the majority of the Common Stock then outstanding, present in person or represented by proxy, the Directors to succeed those whose terms expire and will transact such other business as may properly be brought before the meeting in accordance with Bylaw 8.

3.  *Special Meetings:*

    (a)  Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by law or by the Charter, may be called only by (i) a holder of at least 10% of the outstanding Common Stock or (ii) the Secretary within ten calendar days after receipt of the written request of a majority of the total number of directors of the Company. Any such request by a majority of the Board must be sent to the Secretary and must state the purpose or purposes of the proposed meeting.

    (b)  Upon the receipt by the Company of a written request executed by the holders of at least 10% of the then outstanding Common Stock (a "Meeting Request"), the Board will (i) call a special meeting of the stockholders for any purpose permitted by the Charter and LLC Agreement and (ii) fix a record date for the determination of stockholders entitled to notice of and to vote at that meeting, which record date will not be later than 30 calendar days after the date of receipt by the Company of the Meeting Request.

4.  *Notice of Meetings:*  Written notice of every meeting of the stockholders, stating the place, date, and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, will be given not less than 5 nor more than 30 calendar days before the date of the meeting to each stockholder of record entitled to vote at such meeting, except as otherwise provided in these Bylaws or by law. When a meeting is adjourned to another place, date or time, written notice need not be given of

#441754v3 05346-0001-040

the adjourned meeting if the place, date and time thereof are announced at the meeting at which the adjournment is taken; provided, however, that if the adjournment is for more than 30 calendar days, or if after the adjournment a new record date is fixed for the adjourned meeting, written notice of the place, date and time of the adjourned meeting must be given in conformity with this Bylaw 4. At any adjourned meeting, any business may be transacted which might have been transacted at the original meeting. Any notice herein will be in addition to any notice required by the Company's Charter.

5.  *Inspectors:* The Board may appoint one or more inspectors of election to act as judges of the voting and to determine those entitled to vote at any meeting of the stockholders, or any adjournment thereof, in advance of the meeting. The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the presiding officer of the meeting may appoint one or more substitute inspectors.

6.  *Quorum:* Except as otherwise provided by law or in the Charter, the holders of a majority of the stock issued and outstanding and entitled to vote at a meeting of stockholders, present in person or represented by proxy, will constitute a quorum at all meetings of the stockholders for the transaction of business at a meeting of the stockholders. If, however, such quorum is not present or represented at any meeting of the stockholders, the stockholders entitled to vote at that meeting of stockholders, present in person or represented by proxy, will have the power to adjourn, without notice other than announcement at the meeting, the meeting from time to time until a quorum is present or represented.

7.  *Voting:* Except as otherwise provided by law or in the Charter, each stockholder will be entitled at every meeting of the stockholders to one vote for each share of stock having voting power standing in the name of that stockholder on the books of the Company on the record date for the meeting and those votes may be cast either in person or by written proxy. Every proxy must be duly executed and filed with the Secretary. A stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or another duly executed proxy bearing a later date with the Secretary. The vote upon any question brought before a meeting of the stockholders may be by voice vote, unless otherwise required by these Bylaws or unless the presiding officer of the meeting or the holders of a majority of the outstanding shares of all classes of stock entitled to vote on that question present in person or by proxy at the meeting otherwise determine. Every vote taken by written ballot will be counted by the inspectors of election. When a quorum is present at any meeting, the vote of the holders of a majority of the stock which has voting power present in person or represented by proxy and which has actually voted will decide any question properly brought before such meeting, unless the question is one upon which by express provision of law, the Charter, the LLC Agreement or these Bylaws, a different vote is required, in which case that express provision will govern and control the decision of such question.

GN 0409

8. *Order of Business:*

    (a)    The Chief Executive Officer or the Chairman, or such other officer of the Company designated by a majority of the Board, will call meetings of the stockholders to order and will act as presiding officer thereof.

    (b)    At an annual meeting of the stockholders, only such business will be conducted or considered as is properly brought before the meeting. To be properly brought before an annual meeting, business must be (i) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Chief Executive Officer, the Chairman or a Vice Chairman or the Board in accordance with Bylaw 4, (ii) otherwise properly brought before the meeting by the presiding officer or by or at the direction of a majority of the Whole Board, or (iii) otherwise properly requested to be brought before the meeting by a stockholder of the Company in accordance with Bylaw 8(c).

    (c)    For business to be properly requested by a stockholder to be brought before an annual or special meeting, the stockholder must (i) be a stockholder of the Company of record at the time of the giving of the notice for such meeting provided for in these Bylaws, (ii) be entitled to vote at such meeting or (iii) have given timely notice thereof in writing to the Secretary. To be timely under (iii) above, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Company not less than ten calendar days prior to the date of the stockholder meeting.

9. *Written Action:* Except as otherwise provided by law or by the Charter, any action required to be taken, or which may be taken, at a meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of shares of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of stock entitled to vote thereon were present and voted, provided that prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

## DIRECTORS

10. *Function:*

    (a)    The business and affairs of the Company will be managed under the direction of the Board.

    (b)    The Board may elect from among its members such Chairman or Co-Chairman as it may determine by vote of a majority of its members and vest in him or her such powers as it may determine upon such vote.

#441754v3 05346-0001-040

GN 0410

11. *Number and Term of Office:* The authorized number of Directors will be fixed as provided in the Charter.

12. *Vacancies:* Any vacancies on the Board resulting from death, resignation, disqualification, removal or other cause will be filled solely by a vote of the holders of the majority of the Common Stock then outstanding. Any Director elected in accordance with the preceding sentence will hold office for the remainder of the full term of the Director in which the vacancy occurred and until such Director's successor has been elected and qualified. No decrease in the number of Directors constituting the Board may shorten the term of any incumbent Director.

13. *Removal:* Any Director may be removed at any time, with or without cause, upon the vote of the holders of a majority of the outstanding Common Stock; provided that the Omnicom Director may only be removed upon the written request of Omnicom.

14. *Resignation:* Any Director may resign at any time by giving written notice of his resignation to the Chief Executive Officer, the Chairman or the Secretary. Any resignation will be effective upon actual receipt by any such person or, if later, as of the date and time specified in such written notice.

15. *Regular Meetings:* Regular meetings of the Board may be held immediately after the annual meeting of the stockholders and at such other time and place as may from time to time be determined by the Board. Prior written notice of regular meetings of the Board must be given not less than 24 hours prior to such meeting by mail, telegram, telephone, telex, facsimile or similar medium.

16. *Special Meetings:* Special meetings of the Board may be called by the holders of at least 10% of the outstanding Common Stock on not less than 24 hours prior notice (in addition to such notice as required under the Charter) to each Director by whom such notice is not waived, given either personally or by e-mail or electronic facsimile transmission or similar medium of communication, and will be called by the Chief Executive Officer, the Chairman or the Vice Chairman in like manner and on like notice on the written request of at least two members of the Board. Special meetings of the Board may be held at such time and place as is determined by the Board or specified in the notice of any such meeting.

17. *Quorum:* At all meetings of the Board, a majority of the total number of Directors then in office will constitute a quorum for the transaction of business. Except for actions required by these Bylaws or the Charter to be taken by a majority of the Board, the act of a majority of the Directors present at any meeting convened in accordance with the Charter and these Bylaws at which there is a quorum will be the act of the Board. If a quorum is not present at any meeting of the Board, the Directors present at the meeting may adjourn the meeting from time to time to another place, time or date, without notice other than announcement at the meeting, until a quorum is present.

18. *Written Action:* Any action required or permitted to be taken at any meeting of the Board or of any committee of the Board may be taken without a meeting if all members

GN 0411

of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes or proceedings of the Board or committee.

19. *Participation in Meetings by Telephone Conference:* Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any such committee, by means of telephone conference or similar means by which all persons participating in the meeting can hear each other, and such participation in a meeting will constitute presence in person at the meeting.

20. *Committees:* The Board may not establish any directorate committees.

21. *Compensation:* Members of the Board will not be entitled to compensation for their services but will be entitled to reimbursement of the expenses of attendance at meetings of the Board in accordance with procedures that the Board may determine.

22. *Rules:* The Board may adopt rules for the conduct of its meetings and the management of the affairs of the Company, provided that no such rule may be inconsistent with or substantially frustrate any terms hereof or of the Charter or LLC Agreement (the "Governing Documents"). The provisions hereof will be in addition to the provisions of the Governing Documents, provided, however, that in the event of inconsistency between such provisions, the provisions of the Governing Documents will control.

## OFFICERS

23. *Generally:* The officers of the Company will be elected by the Board and will consist of a Chief Executive Officer, a Chief Financial Officer, a Secretary and a Treasurer. The Board may also choose any one or more Chairmen, Vice Chairmen, Presidents, Vice Presidents, Assistant Secretaries, Assistant Treasurers and such other officers as the Board may from time to time determine. Notwithstanding the foregoing, by specific action, the Board may authorize the Chairman or a Vice Chairman to appoint any person to any office other than Chairman, Vice Chairman, Chief Executive Officer, Secretary or Treasurer. Any number of offices may be held by the same person. Any of the offices may be left vacant from time to time as the Board may determine. In the case of the absence or disability of any officer of the Company or for any other reason deemed sufficient by a majority of the Board, the Board may delegate the absent or disabled officer's powers or duties to any other officer or to any Director.

24. *Compensation:* The compensation of all officers and agents of the Company who are also Directors of the Company will be fixed by the Board or by a committee of the Board. The Board may fix, or delegate the power to fix, the compensation of other officers and agents of the Company to an officer of the Company.

25. *Succession:* The officers of the Company will hold office until their successors are elected and qualified, provided, however, that nothing contained herein will prevent any officer from resigning at any time by giving written notice of such resignation to the Chief Executive Officer, the Chairman or the Secretary. Any resignation will be effective upon actual receipt by any such person or, if later, as of the date and time

GN 0412

specified in such written notice. Subject to the Governing Documents, any officer may be removed at any time with or without cause (a) by the affirmative vote of a majority of the Board or (b) with respect to any officer other than the Chairman, the President, the Chief Executive Officer, the Chief Financial Officer or the Chief Operating Officer, by the President or the Chief Executive Officer. Any vacancy occurring in any office of the Company may be filled by the Board as provided in Bylaw 23.

26.  *Authority and Duties:*  Each of the officers of the Company will have such authority and will perform such duties as are customarily incident to their respective offices, subject to such specific provisions as may be specified from time to time by the Board by Requisite Approval.

## STOCK

27.  *Record Dates:*

(a)  In order that the Company may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which will not be more than 60 nor less than five calendar days before the date of such meeting. . If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders will be at the close of business on the calendar day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the calendar day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of the stockholders will apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting.

(b)  In order that the Company may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion, or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date will not be more than 60 calendar days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose will be at the close of business on the calendar day on which the Board adopts the resolution relating thereto.

(c)  The Company will be entitled to treat the person in whose name any share of its stock is registered as the owner thereof for all purposes, and will not be bound to recognize any equitable or other claim to, or interest in, such share on the part of any other person, whether or not the Company has notice thereof, except as expressly provided by applicable law.

28.  *Stock Record:*  Except for certificates issued to Management LLC and Omnicom, certificates representing shares of stock in the Company will not be issued unless otherwise determined by the Board. The Company will, however, maintain a record of

GN 0413

all stockholders and the number of shares held by them and will certify such record ownership to any person to whom a stockholder reasonably requests that a certification be given.

## INDEMNIFICATION

29.   *Damages and Expenses:*

(a)   Without limiting the generality or effect of any contractual right to indemnification, the Company will to the fullest extent permitted by the DGCL as then in effect indemnify any person (an "Indemnitee") (as if the Company were a corporation subject thereto) who is or was involved in any manner (including without limitation as a party or a witness) or is threatened to be made so involved in any threatened, pending, or completed investigation, claim, action, suit or proceeding, whether civil, criminal, administrative, or investigative (including without limitation any action, suit or proceeding by or in the right of the Company to procure a judgment in its favor) (a "Proceeding") by reason of the fact that such person is or was or had agreed to be a Director, officer, employee, trustee or agent of the Company, or is or was serving at the request of the Board or an officer of the Company as a director, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other entity, whether or not for profit (including the heirs, executors, administrators, or estate of such person), or anything done or not done by such person in any such capacity, against all out-of-pocket expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding. Such indemnification will be a contract right and will include the right to receive payment of expenses as they are incurred by an Indemnitee in connection with such Proceeding, consistent with the provisions of applicable law as then in effect.

(b)   The right of indemnification provided in this Bylaw 29 will not be exclusive of any other rights to which any person seeking indemnification may otherwise be entitled under any other instrument or by reason of any action or otherwise, and will be applicable to Proceedings commenced or continuing after the adoption of this Bylaw 29, whether arising from acts or omissions occurring before or after such adoption.

30.   *Insurance, Contracts, and Funding:*   The Company will purchase and maintain insurance to protect itself and any Indemnitee against any expenses, judgments, fines and amounts paid in settlement or incurred by any Indemnitee in connection with any Proceeding referred to in Bylaw 29 or otherwise, to the fullest extent permitted by applicable law as then in effect. The Company may enter into contracts with any person entitled to indemnification under Bylaw 29 or otherwise, and may create a trust fund, grant a security interest or use other means (including without limitation a letter of credit) to ensure the payment of such amounts as may be necessary to effect indemnification as provided in Bylaw 29. Notwithstanding anything to the contrary contained in Bylaw 29, in the event that the Company enters into a contract with any person providing for

7

GN 0414

indemnification of such person, the provisions of such contract will exclusively govern the Company's obligations in respect of indemnification for or advancement of fees or disbursements of such person's counsel or any other professional engaged by such person.

## GENERAL

31. *Fiscal Year:* The fiscal year of the Company will for accounting and tax purposes begin on January 1 and end on December 31 of each year except for the taxable years in the years of the Company's formation and termination and as otherwise required by law.

32. *Seal:* The Board may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

33. *Reliance upon Books, Reports and Records:* Each Director, each member of a committee designated by the Board, and each officer of the Company will, in the performance of his or her duties, be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by any of the Company's officers or employees, or committees of the Board, or by any other person or entity as to matters the Director, committee member, or officer believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company.

34. *Time Periods:* In applying any provision of these Bylaws that requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days will be used unless otherwise specified, the day of the doing of the act will be excluded and the day of the event will be included.

35. *Certain Defined Terms:* Terms used herein with initial capital letters that are defined in the Company's Organization and Operating Agreement (the "LLC Agreement") or the Charter are used herein as so defined.

GN 0415

GN 0416

Exhibit C

## TAX MATTERS

### I. DEFINED TERMS

1.1.    *Definitions:* Capitalized terms used herein but not defined have the meanings set forth in the Company's Restated Organization and Operating Agreement dated as of March 31, 2004 (the "LLC Agreement"). In addition to capitalized terms defined elsewhere herein, the following terms have the meanings indicated below when used herein with initial capital letters:

"Adjusted Capital Account Deficit" means, with respect to any Stockholder, the deficit balance, if any, in such Stockholder's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (i) credit such Capital Account any amounts which such Stockholder is obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5) and (ii) debit such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and will be interpreted consistently therewith.

"Book Basis" of an asset means, with respect to any asset of the Company, the adjusted basis of the asset for federal income tax purposes, except as follows:

(a)    The initial Book Basis of any asset contributed by a Stockholder to the Company will be the gross fair market value of such asset, as determined by the Stockholders, and consistent with the foregoing, the Stockholders agree that the fair market value of each of the Securities is equal to the adjusted tax basis thereof in the hands of the contributors of such Securities immediately prior to their contribution to the Company;

(b)    The Book Basis of all assets of the Company will be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as determined by the Stockholders as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Stockholder in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Stockholder of more than a de minimis amount of property as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), provided that an adjustment described in clauses (i) and (ii) of this paragraph will be made only if Omnicom determines that such adjustment is necessary to reflect the relative economic interests of the Stockholders;

(c)    The Book Basis of assets of the Company distributed to any Stockholder will be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Stockholders; and

#441750v2 05346-0001-040

(d)  The Book Basis of assets of the Company will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and subparagraph (vi) of the definition of "Profit" and "Loss" hereof; provided, however, that Book Basis will not be adjusted pursuant to this subparagraph (d) to the extent that an adjustment pursuant to subparagraph (b) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Book Basis of an asset has been determined or adjusted pursuant to subparagraph (a), (b) or (d), such Book Basis will thereafter be adjusted by the depreciation taken into account with respect to such asset under Treasury Regulation Section 1.704-1(b)(2)(iv)(g), for purposes of computing Income and Losses.

"Capital Account" means, with respect to each Stockholder, such Stockholder's capital account maintained pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv) except as may otherwise be provided herein. The Capital Account of each Stockholder on the date hereof shall be as set forth on Schedule C-1.

"Code" means the Internal Revenue Code of 1986, as amended (or any corresponding provision or provisions of any succeeding law).

"Fiscal Year" means the taxable year of the Company for federal income tax purposes.

"Loss" means, for each Fiscal Year or other period of determination, an amount equal to the Company's items of taxable deduction and loss for such year or other period, determined in accordance with Section 703(a) of the Code (including all items of loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(a)  Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Loss, will be considered an item of Loss;

(b)  Loss resulting from any disposition of property of the Company with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of such property, notwithstanding that the adjusted tax basis of such property may differ from its Book Basis;

(c)  In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account depreciation for the taxable year or other period as determined in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(d)    Any items of deduction and loss specially allocated pursuant to Section 2.4 will not be considered in determining Loss; and

(e)    Any decrease to Capital Accounts as a result of any adjustment to the Book Basis of the Company's assets pursuant to clauses (b), (c) or (d) of the definition of Book Basis will constitute an item of Loss.

"Net Loss" means, for any period, the excess of items of Loss over items of Profit, if applicable, for such period determined without regard to any items of Profit or Loss allocated pursuant to Section 2.3.

"Net Profit" means, for any period, the excess of items of Profit over items of Loss, if applicable, for such period determined without regard to any items of Profit or Loss allocated pursuant to Section 2.3.

"Profit" means, for each Fiscal Year or other period of determination, an amount equal to the Company's taxable income and gain for such year or other period, determined in accordance with Section 703(a) of the Code (including all items of income and gain required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss will be added to taxable income or loss;

(b)    Gain resulting from any disposition property of the Company with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of such property, notwithstanding that the adjusted tax basis of such property may differ from its Book Basis;

(c)    Any items specially allocated pursuant to Section 2.4 will not be considered in determining Profit; and

(d)    Any increase to Capital Accounts as a result of any adjustment to the Book Basis of the Company's assets pursuant to clauses (b), (c) or (d) of the definition of Book Basis will constitute an item of Profit.

"Stockholder" means any Person that owns Preferred Stock or Common Stock as of the date of the LLC Agreement.

## II. ALLOCATIONS

2.1.    *Allocation of Profits and Losses.*  The items of Profit and Loss comprising Net Profit or Net Loss for a Fiscal Year will be allocated among the Stockholders during such Fiscal Year in a manner that will, as nearly as possible, cause the Capital Account balance of each Stockholder at the end of such Fiscal Year to equal the excess (which may be negative) of:

(a)    the hypothetical distribution (if any) that such Stockholder would receive if, on the last day of the Fiscal Year, (i) assets of the Company, including cash, were sold

GN 0419

for cash equal to their Book Basis, taking into account any adjustments thereto for such taxable year, (ii) all liabilities of the Company were satisfied in cash according to their terms (limited, with respect to each nonrecourse liability, to the Book Basis of the assets securing such liability), and (iii) the net proceeds thereof (after satisfaction of such liabilities) were distributed in full pursuant to Section 18(b) of the Charter, over;

    (b)    the sum of (i) the amount, if any, which such Stockholder is obligated to contribute to the capital of the Company, (ii) such Stockholder's share of the "minimum gain" of the Company determined pursuant to Regulations Section 1.704-2(g), and (iii) such Stockholder's share of partner nonrecourse debt minimum gain determined pursuant to Regulations Section 1.704-2(i)(5), all computed immediately prior to the hypothetical sale described in Section 2.1(a).

Notwithstanding anything in the foregoing to the contrary:

    (a)    the net excess of items of income and gain, on the one hand, over items of deduction and loss, on the other hand, allocated hereunder in respect of any Fiscal Year to Management LLC shall in no case exceed the total cash distributions made to Management LLC under Section 2.2 of the restated Organization and Operating Agreement ("Restated LLC Agreement") from the date hereof through the end of the Fiscal Year in respect of which such allocation is made; and

    (b)    if in any Fiscal Year in respect of which Management LLC receives a distribution under Section 2.2 of the Restated LLC Agreement, the Company has insufficient gross income to satisfy the allocations that would otherwise be made pursuant to this Section 2.1 of this Exhibit C, any such distribution in excess of the positive balance in the capital account of Management LLC immediately before such distribution shall be treated as a guaranteed payment within the meaning of Section 707 of the Code, and 100% of any deduction attributable to such guaranteed payment shall be allocated 100% to Omnicom.

All of the foregoing shall be determined in the good faith discretion of Omnicom.

2.2.    *Determination of Items Comprising Allocations.* (a) In the event that the Company has Net Profit for a Fiscal Year,

    (i)    for any Stockholder as to whom the allocation pursuant to Section 2.1(a) is negative, such allocation will be comprised of a proportionate share of each of the items of Loss entering into the computation of Net Profit for such Fiscal Year; and

    (ii)    the allocation pursuant to Section 2.1 in respect of each Stockholder (other than a Stockholder referred to in Section 2.2(a)(i)) will be comprised of a proportionate share of each item of Profit and Loss entering into the computation of Net Profit for such Fiscal Year (other than the portion of each item of Loss, if any, that is allocated pursuant to Section 2.2(a)(i)).

    (b)    In the event that the Company has a Net Loss for a Fiscal Year,

GN 0420

(i)    for any Stockholder as to whom the allocation pursuant to Section 2.1 is positive, such allocation will be comprised of a proportionate share of the items of Profit entering into the computation of Net Loss for such Fiscal Year; and

(ii)    the allocation pursuant to Section 2.1 in respect of each Stockholder (other than a Stockholder referred to in Section 2.2(b)(i)) will be comprised of a proportionate share of each item of Profit and Loss entering into the computation of Net Loss for such Fiscal Year (other than the portion of each item of Profit, if any, that is allocated pursuant to Section 2.2(b)(i)).

(c)    For purposes of this Section 2.2, a gain recognized by the Company upon the disposition of an item of property will be considered to be a single item of gain regardless of whether, for federal income tax purposes, part of the gain is treated differently from the remainder.

2.3.    *Special Allocations and Compliance with Section 704(b):*  The following special allocations will, except as otherwise provided, be made in the following order:

(a)    Notwithstanding anything to the contrary contained in this Article II, if there is a net decrease in "minimum gain" or in any "partner nonrecourse debt minimum gain" (both as determined pursuant to Treasury Regulation Section 1.704-2) during any Fiscal Year or other period, prior to any other allocation pursuant hereto, Stockholders will be specially allocated items of Profit for such year (and, if necessary, subsequent years) in an amount and manner required by Treasury Regulation Sections 1.704-2(f) or 1.704-2(i)(4).  The items to be so allocated will be determined in accordance with Treasury Regulation Section 1.704-2;

(b)    "Nonrecourse deductions" (as defined in Treasury Regulation Section 1.704-2) for any Fiscal Year or other period will be allocated to the Stockholders owning Common Stock pro rata in proportion to their percentage ownership thereof;

(c)    Any "partner nonrecourse deductions" (as defined in Treasury Regulation Section 1.704-2) for any Fiscal Year or other period will be allocated to the Stockholders that made or guaranteed or are otherwise liable with respect to the loan to which such partner nonrecourse deductions are attributable in accordance with principles under Treasury Regulation Section 1.704-2(i);

(d)    Any Stockholder who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which causes or increases a negative balance in his or its Capital Account will be allocated items of Profit sufficient to eliminate such increase or negative balance caused thereby, as quickly as possible, to the extent required by such Treasury Regulation; and

(e)    To the extent any Stockholder in any Fiscal Year has income on account of the receipt of a capital interest in the Company within the meaning of the regulations under Section 721, any deduction, to the extent and only to the extent allowable in such Fiscal Year, attributable to such receipt shall be specially allocated to such Stockholder.

#441750v2 05346-0001-040                              5

(f)     No allocation or loss or deduction will be made to any Stockholder if, as a result of such allocation, such Stockholder would have an Adjusted Capital Account Deficit.

2.4.     *Section 704(c) Allocation:*  If any property of the Company is subject to Code Section 704(c) or is reflected in the Capital Accounts of the Stockholders and on the books of the Company at a value that differs from the adjusted tax basis of such property, then the tax items with respect to such property will, in accordance with the requirements of Treasury Regulations Section 1.704-1(b)(4)(i), be shared among the Stockholders in a manner that takes account of the variation between the adjusted tax basis of the applicable property and its value in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Stockholders' share of tax items under Code Section 704(c).

2.5.     *Tax Matters:*  (a)  Omnicom will be designated as "Tax Matters Partner" (as defined in Code Section 6231) (the "Tax Matters Partner"), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and to expend the Company funds for professional services and costs associated therewith.  In its capacity as Tax Matters Partner, Omnicom will oversee the Company's tax affairs in the overall best interests of the Company as Omnicom determines in its sole discretion.

(b)     The Tax Matters Partner on behalf of the Company may make all elections for federal income tax purposes and will be entitled to approve any tax return of the Company prior to filing thereof.

2.6.     *Reports:*  (a)  Within 30 calendar days after the end of each fiscal quarter and within 45 calendar days after the close of each Fiscal Year of the Company, the Company will cause to be prepared and submitted to each Stockholder (i) the balance sheet as of the end of such period and a statement of income or loss and a statement of cash flows for such period and (ii) in the case of any Fiscal Year, an opinion of a nationally recognized accounting firm based upon their audit of the financial statements referred to in the preceding clause (i).  Within a reasonable period after the end of each Fiscal Year, as determined by the parties hereto, the Company will provide to the Stockholders all information necessary for them to complete federal and state income tax returns.

(b)     For financial reporting purposes, the books and records of the Company will be kept on the accrual method of accounting.

(c)     To the extent permitted by the Code, the Regulations or other applicable law and regulations, the Company upon approval of the Board may elect to use a method of accounting that permits accelerated deductions.

(d)     The parties hereto agree to make all filings consistent with this Exhibit, including Schedule C-1 hereto.

GN 0422

SCHEDULE C-1

## Capital Accounts

PGNT Management LLC        $0

Omnicom Group Inc.        (being calculated by the accountants)

GN 0423