William C. Rand, Esq.
LAW OFFICE OF WILLIAM COUDERT RAND
711 Third Ave., Suite 1505
New York, New York  10017
(Phone) (212) 286-1425; (Fax)(212) 599-7909
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
MICHAEL P. TIERNEY,                           :      07 Civ. 4090 (BSJ)
                                       :
                 Plaintiff,         :
                                       :
           -against-             :
                                       :
GERARD A. NEUMANN,              :
                                       :
                 Defendant.      :
                                       :
----------------------------------------------------------------------X


# **EXHIBIT D**

## **TO THE**

## **DECLARATION OF WILLIAM C. RAND IN SUPPORT OF PLAINTIFF'S MOTION TO AMEND THE COMPLAINT HEREIN**

William C. Rand, Esq.
LAW OFFICE OF WILLIAM COUDERT RAND
711 Third Ave., Suite 1505
New York, New York  10017
(Phone) (212) 286-1425; (Fax)(212) 599-7909
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
MICHAEL P. TIERNEY,                                          :          07 Civ. 4090 (BSJ)
Individually and Derivatively on behalf of          :
Seneca Investments, LLC,                                   :
                                                                            :
                                        Plaintiff,                 :          FIRST AMENDED
                                                                            :          COMPLAINT
                    -against-                                        :
                                                                            :
GERARD A. NEUMANN,                                      :
                                                                            :
                                        Defendant,               :
                                                                            :
                    -and-                                             :
                                                                            :
SENECA INVESTMENTS, LLC,                           :
                                                                            :
                                        Nominal Defendant.    :
                                                                            :
-----------------------------------------------------------------------X

        Plaintiff Michael P. Tierney ("Plaintiff" or "Tierney"), individually and

derivatively on behalf of Seneca Investments, LLC, alleges upon personal knowledge as

to himself and his own acts and upon information and belief as to all other matters for his

Complaint against Gerard A. Neumann ("Defendant") and Seneca Investments, LLC

("Nominal Defendant" or "Seneca")) as follows:

## THE PARTIES

1.        Plaintiff Michael P. Tierney is a resident of the State of Connecticut.

Tierney was a stockholder of Seneca from its formation to the present and was a director

and the Chief Executive Officer of Seneca from its formation until at least February 27, 2008.

2.    Defendant Gerard A. Neumann ("Neumann") is a resident of the State of New Jersey.  Neumann was a stockholder, director, and the Chief Financial Officer of Seneca from its formation until February 27, 2008.

3.    Nominal Defendant Seneca Investments, LLC is  Delaware limited liability company whose principal place of business is located at 437 Madison Avenue, 9th Floor, New York, N.Y. 10022.

## JURISDICTION AND VENUE

4.    Jurisdiction is conferred by 28 U.S.C. § 1331(a) based upon the diversity of citizenship of the parties to this action and the sum in dispute between the parties which is in excess of Seventy-Five Thousand Dollars ($75,000).

5.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York, and the Nominal Defendant is subject to personal jurisdiction in the Southern District of New York.

## NATURE OF ACTION

6.    At all relevant times, Plaintiff was the beneficial owner of 40% of a Delaware limited liability company called Seneca Investments LLC. ("Seneca").  He was also at all relevant times the Chief Executive Officer of Seneca and one of three Seneca Directors.

7.    At all relevant times, Neumann was the beneficial owner of 20% of Seneca.  He was also at all relevant times its Chief Financial Officer and a member of its

Board of Directors.

8.      Omnicom Group Inc. ("Omnicom"), a large New York-based advertising company, owned the remaining 40% of the shares of Seneca.  Its nominee, Dara Akbarian ("Akbarian"), was the third member of the Board of Directors of Seneca.

9.      At all relevant times, the relationships among Plaintiff, Neumann and Omnicom, and the operation of Seneca, have been governed by an Amended Charter (the "Seneca Charter") and Restated Organization and Operating Agreement (the "Seneca Operating Agreement"), both dated March 31, 2004.

10.     On February 28, 2008, Omnicom paid Neumann approximately $11,000,000 in cash (the "Neumann Payment") in part for his vote to remove Plaintiff as a Director and as the Chief Executive Officer of Seneca, and in part for the transfer of his shares in Seneca.

11.     After the Neumann Payment, Omnicom appointed three of its employees as the sole members of the Seneca Board of Directors.

12.     Neumann surreptitiously began negotiating the Neumann Payment in June of 2007 or earlier, without at any time disclosing such negotiations to Plaintiff or the Seneca Board of Directors.

13.     While Neumann was negotiating the Neumann Payment, there were several important Seneca matters involving Omnicom before Neumann in his capacities as a Seneca Director and a Seneca Officer, which required his independent and good faith analysis, decisions and actions.

14.     However, between early 2007 and February 27, 2008, while he was a Director and the Chief Financial Officer of Seneca, Neumann:

        a.   repeatedly and intentionally breached his contractual obligations to

3

Plaintiff under the terms of the Seneca Charter and Seneca Operating Agreement;

b.  repeatedly and intentionally committed numerous acts and omissions constituting bad faith violations of his implied contractual covenants of good faith and fair dealing;

c.  consciously and repeatedly disregarded and abdicated his duties as a Director and Officer of Seneca;

d.  surreptitiously and wrongfully arrogated to himself several major corporate opportunities of Seneca;

e.  tortiously interfered with Plaintiff's contractual rights as specified in the Seneca Charter and Operating Agreement; and

f.  wrongfully and clandestinely converted for his personal use property rightfully belonging to Plaintiff.

## FACTUAL ALLEGATIONS

### A.  Background

15.    Seneca was formed by Omnicom in May of 2001.  At all times its offices have been in New York County, New York.

16.    The original formation of Seneca in May of 2001, and its subsequent operation, by Omnicom is the subject of a large class action federal securities fraud litigation against Omnicom and certain of its senior officers in the Southern District of New York. In re Omnicom Group, Inc. Securities Litigation, 02 CV-4483 (WHP) (the "Omnicom Securities Fraud Class Action").  None of Seneca, Plaintiff or Neumann is a party in the Omnicom Securities Fraud Class Action.

17.     On March 31, 2004, Omnicom restructured the ownership of Seneca so that its equity was beneficially owned 40% by Omnicom, 40% by Plaintiff and 20% by Neumann. Under the terms of the Seneca Charter and the Operating Agreement, Seneca is to be governed as if it were a Delaware corporation. As a result of that restructuring, Seneca also owed Omnicom a $24 million Note.

18.     On March 31, 2004, Omnicom clandestinely transferred all of its financial interest in the equity of Seneca to the Wharton School of Business.  In June of 2007, Omnicom clandestinely re-acquired that Seneca financial interest from Wharton.

19.     At all relevant times, Neumann controlled all Seneca's bank accounts and cash distributions to shareholders.

20.     Omnicom, Neumann and Plaintiff agreed that Seneca should (a) liquidate all its assets on reasonable terms as soon as possible, (b) use the proceeds to repay the $24 million note to Omnicom, and (c) distribute the remaining proceeds to the shareholders.

21.     Seneca's Operating Agreement explicitly requires the distribution of available cash to shareholders. Section 2.2 thereof reads:

> Distributions of available cash for any Fiscal Year shall be made to the Stockholders in accordance with the number of Common Shares held by each.

22.     Consistent with the parties' intention that Seneca's sole "business" was to liquidate it assets and distribute the proceeds to shareholders, Seneca has had no employees, no premises and virtually no expenses.

23.     Since Seneca is a "tax pass-through" entity, its shareholders are taxed on any Seneca profit whether or not they receive funds from Seneca.

24.     Therefore, Section 2.1(b) of the Seneca Operating Agreement requires at a minimum that Seneca distribute a cumulative Tax Distribution to each shareholder to cover their tax liability.

25.     Section 2.6 (a) of Exhibit C to the Operating Agreement, entitled "Tax Matters", required Seneca to provide to each shareholder certain financial information each quarter, as well as, for each year, "all information necessary for them to complete federal and state income tax returns".

26.     From March 31, 2004 through December of 2006, Seneca proceeded to liquidate its assets on reasonable terms in accordance with the agreement of the parties. By April of 2006, Seneca had repaid all of the $24 million Note to Omnicom.

27.     In April and November of 2006, as required by the Seneca Operating Agreement, Neumann (a) calculated Seneca's available cash, and (b) made shareholder distributions therefrom.

28.     From March 31, 2004 through December 2006, Neumann engaged independent tax advisors on behalf of Seneca to make all necessary tax calculations and provide Seneca shareholders with all necessary information for their individual tax returns.

29.     From March 31, 2004 through the end of 2006, Neumann as Seneca's Chief Financial Officer regularly distributed all proceeds from asset sales to Seneca's shareholders, or held those proceeds in cash for the benefit of all shareholders.

30.     At the end of 2006, the principal assets of Seneca were (a) approximately $2,000,000 in cash, (b) 2,123,637 shares of a publicly traded company called Taleo Corporation ("Taleo"), and (c) an investment in a private company called Media Space Solutions ("Media Space").

31.     In February of 2007, Plaintiff filed a lawsuit against Omnicom in Federal Court in the Southern District of New York.  That lawsuit (the "Options Claim") seeks payment by Omnicom for the value of various stock options issued by Omnicom to Plaintiff.

32.     Since the filing of the Options Claim and through the present, as detailed below, Neumann has refused to comply with his obligations of good faith and fair dealing under the Seneca Operating Agreement and has intentionally and in bad faith breached his duties of care and loyalty to Seneca and its stockholders and directors, including Plaintiff.  To the contrary, as detailed below, Neumann and his legal counsel (paid by Neumann with funds from Seneca) have clandestinely conspired with Omnicom to benefit Neumann to the substantial detriment of Seneca and Plaintiff.

**B.  Neumann's Responsibilities and Obligations As a Director and Officer of Seneca**

33.     As Seneca's Chief Financial Officer, Neumann was responsible for

  a.  determining the amount of "available cash" for purposes of shareholder distributions under Section 2.2 of the Operating Agreement;

  b.  making such shareholder distributions;

  c.  calculating and making Tax Distributions to the Seneca shareholders;

  d.  providing the quarterly and annual financial reports required under the Operating Agreement;

  e.  providing the information necessary for the Seneca shareholders to complete their tax returns, as required under the Operating Agreement;

  f.  engaging such independent advisors on behalf of Seneca as were required to assist him in fulfilling these responsibilities.

34.     As one of three Directors of Seneca, and Seneca's Chief Financial Officer with exclusive control over Seneca's financial accounts and cash, Neumann owed a fiduciary duty of loyalty and care to Seneca and Plaintiff.

35.     As a party to the Seneca Operating Agreement and the Seneca Charter, Neumann also had an implied contractual covenant of good faith and fair dealing to Plaintiff.

36.     Because of the Options Claim filed by Plaintiff against Omnicom, Neumann was the only nominally independent director of Seneca, and his fiduciary duties and requirements to act in good faith were only heightened.

### C.  Neumann's Refusal To Make Distributions of Available Cash

37.     As alleged, Section 2.2 of the Operating Agreement requires Seneca to make pro-rata distributions of "available cash" to shareholders.

38.     Neumann, as Seneca's Chief Financial Officer, had prior to 2007 regularly determined Seneca's "available cash" and made shareholder distributions.

39.     After Plaintiff filed the Options Claim against Omnicom, Neumann suddenly refused to make any further shareholders distributions or Tax Distributions.

40.     He also refused to make any calculations of "available cash" for purposes of Section 2.2 of the Operating Agreement.  He also refused to provide to Plaintiff the financial and tax information required under the Operating Agreement.

41.     Plaintiff, as Seneca's Chief Executive Officer, explicitly and repeatedly instructed Neumann to make shareholders' distributions of available cash.

42.     The law firm of Burke Mackay Warren and Serittella ("Burke Mackay), on behalf of Seneca, reviewed the Seneca corporate documents and issued a written

8

opinion that the Seneca corporate documents required distribution of available cash to shareholders.  (Burke Mackay, with Neumann's approval, had represented Seneca on other matters as well.)

43.    Seneca's longstanding tax advisors, Farkouh, Furman & Faccio, also confirmed to Neumann their interpretation of the Seneca corporate documents as calling for the pro-rata distribution to shareholders of all available cash.

44.    Neumann was well aware of both the Burke Mackay and the Farkouh Furman opinions that he should immediately make a pro-rata distribution of available cash to shareholders under Section 2.2 of the Operating Agreement.

45.    Throughout 2007, Seneca had no less than $2,000,000 of cash.

46.    Seneca has and had no corporate need for the cash it holds.  It has no paid employees, and pays no management or other fees.  It has virtually no expenses or liabilities.

47.    On December 26, 2007, Neumann acknowledged in writing that "Seneca's governing documents mandate a distribution of excess cash annually".

48.    Nevertheless, Neumann refused to make any calculation of "available cash", or to make any pro-rata distribution of Seneca's available cash to its shareholders.

49.    Instead, as is now evident, commencing in June of 2007 Neumann and his legal counsel began clandestine negotiations with Omnicom to receive an $11,000,000 cash payment, part of which was specifically calculated to equal Neumann's pro-rata distribution to Seneca's cash.

50.    Neumann and his counsel were negotiating the Neumann Payment for the personal benefit of Neumann at the same time they refused to make a pro-rata distribution of Seneca's cash to Plaintiff.

**D.  Sale or Distribution of Taleo Shares**

51.     Since early 2006, Seneca's major asset has been 2,123,637 publicly traded shares in Taleo.

52.     Since March 1, 2007 through close of the market on Friday, August 29, 2008, the value of Seneca's Taleo stock has ranged between approximately $33 million and $71 million.  Thus, the Taleo shares represented by far the majority of Seneca's assets.

53.     As the Chief Executive Officer of Seneca, Plaintiff repeatedly urged the Seneca board of directors to consider selling some of the Taleo shares, or distributing them to the Seneca shareholders so each could make its own investment decision.

54.     There was no business purpose for Seneca to continue to hold Taleo shares at any time.  Indeed, through early 2007, both Omnicom and Neumann sought the pro-rata distribution of Taleo shares to Seneca's shareholders.

55.     For example, Randall Weisenburger, the Chief Financial Officer of Omnicom told Neumann in 2006 that he wanted Seneca to distribute to Omnicom at least 400,000 shares of Taleo stock so that he could provide the proceeds to Wharton.

56.     Similarly, on many occasions, Neumann expressed his strong desire that Seneca distribute to him his pro-rata share of Taleo shares, or that Seneca sell its position in Taleo and distribute to him his pro-rata share of the proceeds.

57.     However, following the filing by Plaintiff of the Options Claim against Omnicom, Omnicom told Neumann that it would refuse to allow any distributions of Seneca assets to shareholders, for the sole purpose of injuring Plaintiff.

58.     By e-mail dated February 14, 2007, Neumann informed Plaintiff that

"Randy [Weisenburger] clearly seems to believe that not letting any of us get to the Seneca assets will be more painful for you than for Omnicom."

59.    Seneca could have distributed the Taleo shares to its shareholders at any time.  Similarly, it could have sold some or all of those shares at any time.

60.    For example, in June of 2007, the major institutional shareholders of Taleo exercised their rights to make a secondary offering of some of their shares into the public market.

61.    By letter dated June 4, 2007, Plaintiff recommended to the Seneca board that Seneca sell some of its Taleo shares, in the same percentages as other institutional shareholders.

62.    Omnicom's nominee director, without providing any reason therefor, voted against allowing Seneca to sell any Taleo shares.

63.    As a Director and Officer of Seneca, Neumann had a fiduciary duty to inform himself of all relevant facts, and to make an independent decision regarding the sale or distribution of Seneca shares on the basis of the best interests of Seneca and all of its shareholders.

64.    This was particularly true, since Neumann's vote was the deciding one regarding the sale or distribution of Taleo shares.

65.    However, Neumann refused to take any decision, to state any position or even to respond to Plaintiff's repeated requests for his opinion as a Director and Officer of Seneca regarding when Seneca should sell Taleo shares, in what amounts, and at what prices.

66.    As a result, Seneca was unable to, and did not, participate in the secondary offering of Taleo shares.  Those shareholders which did participate were able to sell their

Taleo shares at approximately $19.00 per share.

67.    After June 2007, Plaintiff repeatedly urged Neumann, as a director of Seneca, to permit Seneca to sell Taleo shares, or distribute them to shareholders.

68.    Plaintiff also repeatedly asked Neumann, in the event he did not wish to sell or distribute Taleo shares, to state his views as to what price, in which amounts and at what times Seneca should sell its Taleo shares.

69.    Plaintiff also repeatedly requested a board meeting to discuss Seneca affairs, and in particular the distribution or sale of Taleo shares.

70.    Neumann continued to refuse to provide any response to Plaintiff's requests concerning Taleo shares, or to participate in any board meeting or discussion relating to them.

71.    Neumann as an officer and director of Seneca failed to exercise any business judgment at all with respect to how to handle Seneca's major asset, its shares in Taleo.

72.    On November 5, 2007, when Taleo shares were trading between $25 and $30 a share, Neumann finally wrote Plaintiff that he felt Seneca should sell its Taleo shares. Neumann asked Plaintiff to describe the logistics for effecting such a sale.

73.    In a communication dated November 6, 2007, Plaintiff described the mechanism for effecting a sale by Seneca of the Taleo shares, and urged both directors to provide the necessary authorization promptly.

74.    However, Neumann refused to respond to Plaintiff's November 6, 2007 communication.

75.    Neumann refused to take any steps to implement the sale or distribution of Seneca's Taleo shares.

76.     Seneca could have sold its Taleo shares within two weeks of Neumann approving such sale.

77.     There was no benefit to Seneca or its shareholders at any time as a result of Seneca not distributing its shares to shareholders.

78.     To the contrary, Seneca and Plaintiff were substantially damaged by Neumann's refusal to implement his stated intention to have Seneca sell the Taleo shares.

79.     However, Neumann ensured that there was a benefit to himself. Unbeknownst to Plaintiff, Neumann continued his secret negotiations with Omnicom to receive a cash payment based on his pro-rata shares of the Taleo stock owned by Seneca, while refusing to allow Seneca to sell that same stock at the same price.

80.     During this time period, Taleo's stock traded as high as $33.97.

81.     From early 2007 through February 28, 2008, Neumann completely and repeatedly abdicated his responsibilities as a Director and Officer on the important company matter of the sale or distribution of Taleo shares.

82.     However, as is now evident, during all of this time, Neumann was secretly negotiating to sell his share of the Taleo shares to Omnicom for the same price which Seneca could have received.

83.     The secret $11,000,000 cash Neumann Payment finally received by Neumann on February 27, 2008 was specifically calculated to provide Neumann with his pro-rata value of Seneca's Taleo shares.

84.     Specifically, the major component of the Neumann Payment was expressly calculated on the basis of the stock market price of Taleo shares as of the market close on February 26, 2008, which was $19.06.

85.     Thus, rather than allowing Seneca to sell some or all of its Taleo shares

into the market for the benefit of all shareholders, as Plaintiff had recommended to the Seneca board for the past year, and as Neumann himself had finally stated in December of 2007 he wished to do, he instead consummated a surreptitious cash transaction with Omnicom by which he effectively sold his own Taleo shares.

86.     Neumann's agreement to sell his Seneca interest based on a $19.06 price of the Taleo stock reflects his personal belief and best judgment that such price was an appropriate value for the sale of Taleo shares.

87.     As alleged, from June through the end of 2007 Plaintiff had repeatedly sought approval from Neumann as a director and officer of Seneca for the sale by Seneca of its Taleo shares at a price of $19.06 or higher.  During all of this time, Seneca could have sold its Taleo shares at such a price or higher.

88.     As is now evident, while Neumann was continuing to refuse to take any action on behalf of Seneca with respect to its sale of Taleo shares, he was surreptitiously and actively seeking to sell his own pro-rata portion of Seneca's Taleo shares for his personal benefit.

89.     As early as June of 2007, as is now evident, Neumann had already reached a personal business decision that it made sense for him to sell his portion of the Taleo shares at the market price for such shares.

90.     As a director and officer of Seneca, however, Neumann refused to allow Taleo to sell its Taleo shares at the same price he was prepared to sell them for his personal benefit..

**E.  Sale of Media Space**

91.     As alleged, Seneca's only assets, besides cash, were its Taleo shares and an investment in a private company called Media Space Solutions ("Media Space").

92.     In December of 2007, Neumann informed Plaintiff that he was negotiating, allegedly on behalf of Seneca, to sell Seneca's investment in Media Space for approximately $16,000,000.

93.     Plaintiff, in his capacity as a member of the board of directors and the Chief Executive Officer of Seneca, asked Neumann for financial information on Media Space and other information which could help him determine the appropriate value of the investment.

94.     Neumann refused to provide Plaintiff with such financial information, or otherwise to provide Plaintiff any information concerning his negotiations to sell Media Space on behalf of and for the benefit of Seneca.

95.     During all this time, it is now evident that Neumann was secretly negotiating to sell his portion of Seneca's Media Space investment to Omnicom, while denying Seneca and all of its shareholders the opportunity to sell Media Space.

96.     It is also now evident that, as early as May of 2007, Neumann was providing detailed financial information on Media Space to Omnicom in the context of the $11,000,000 Neumann Payment, at the same time he refused to provide Plaintiff the same, or indeed any, information concerning Media Space.

97.     As with the Taleo shares, Neumann was negotiating surreptitiously to sell only his pro-rata portion of Seneca's Media Space shares, rather than negotiate the sale of such Media Space shares by Seneca for the benefit of all shareholders.

98.     The $11,000,000 Neumann Payment was calculated based on a value of Seneca's Media Space of $15,392,774.

99.     At no time did Neumann disclose to Plaintiff or the Seneca board of directors his clandestine negotiations with Omnicom involving Seneca's Media Space

shares.

## F.  Legal Fees Related To Omnicom Securities Fraud Litigation

100.    In June of 2005, Plaintiffs in the Omnicom Securities Fraud Class Action (the "Class Action Plaintiffs"), which focused on Omnicom's allegedly illegal formation and control of Seneca, commenced discovery.

101.    As part of that discovery, the Class Action Plaintiffs deposed Plaintiff and Neumann, and served multiple document requests on them and Seneca.

102.    In late 2005, with the express approval of Omnicom, Plaintiff, Neumann and Seneca engaged the law firm of O'Melveny & Myers as counsel to represent them in connection with such depositions and document requests.

103.    O'Melveny & Myers confirmed with Omnicom's General Counsel, Michael O'Brien, that all of its legal fees would be covered by Omnicom pursuant to various indemnification agreements dated May 1, 2001 and executed by Omnicom in favor of Plaintiff, Neumann and Seneca (the "Indemnification Agreements").

104.    O'Melveny & Myers submitted bills to Seneca totaling in excess of $1.8 million, expressly indicating that they were to be forwarded to Omnicom for payment under the Indemnification Agreements.

105.    Between December 2005 and June 2007, Omnicom paid approximately $1.5 million directly to O'Melveny & Myers pursuant to the Indemnification Agreements.

106.    However, by letter dated August 9, 2007, Omnicom took a new position. In that letter, Omnicom claimed that it had merely "advanced" the amounts to O'Melveny & Myers on behalf of Seneca.

107.    In its August 9, 2007 letter, Omnicom now claimed that (i) the Indemnification Agreements did not cover legal expenses incurred by Seneca (as opposed to Plaintiff and Neumann), and (ii) Seneca's share of legal fees presented by O'Melveny & Myers was 60% of all such fees.

108.    In its August 9, 2007 letter, Omnicom demanded payment from Seneca to Omnicom of the amount of $1,171,850.96.

109.    As a Director and the Chief Executive Officer of Seneca, Plaintiff urgently sought the positions of, and action from, Akbarian and Neumann, to protect the interests of Seneca and its shareholders.

110.    As a nominee of Omnicom, Akbarian was in an obvious conflict-of-interest position.  Neumann's independent analysis and action as a Director and Officer of Seneca was therefore essential.

111.    Plaintiff pointed out to Akbarian and Neumann that, in the May 2, 2001 Stockholder Indemnification Agreement executed by Omnicom, Seneca is defined as an "Indemnified Party" pursuant to Sections 1(a) and (e).  As such, Seneca is entitled to full coverage of its legal fees incurred in the Omnicom Securities Fraud Action, as well as fees and expenses incurred in enforcing its indemnification rights.

112.    Plaintiff also pointed out that there was never any understanding, written or oral, between Seneca and Omnicom that amounts paid to O'Melveny & Myers by Omnicom under the Indemnification Agreements were an "advance" to be repaid by Seneca.

113.    Finally, Plaintiff pointed out that, in any case, there was no basis for Omnicom's arbitrary assertion that 60% of O'Melveny & Myer's legal fees were allocable to representation of Seneca, as opposed to representation of Plaintiff and

Neumann.

114.    Plaintiff urgently sought Neumann's position with respect to Omnicom's letter, and requested a board meeting to discuss the issue.

115.    Plaintiff also requested Akbarian and Neumann to approve the retention by Seneca of independent counsel to review and, if necessary, enforce Seneca's rights against Omnicom with respect to Omnicom's demand for a payment of over $1 million.

116.    Neumann refused to provide any response, and refused to take any action as an Officer or as  a Director of Seneca, to protect Seneca's rights with respect to Omnicom's highly questionable demand for legal fees from Seneca.

117.    During all this time, it is now evident that Neumann was secretly negotiating the $11,000,000 cash Neumann Payment to himself from Omnicom.


**G.  Legal Fees Relating To Instant Litigation**

118.    In April of 2007, Plaintiff filed the original complaint in this action, seeking damages against Neumann for his refusal to distribute cash as required by the Seneca Operating Agreement.

119.    Neumann was and is the beneficiary of a D&O Indemnification Agreement executed by Omnicom on May 1, 2001 (the "Omnicom Indemnification Agreement") and covering all claims made against Neumann as an Officer or Director of Seneca.

120.    Neumann claimed and received reimbursement from Omnicom under the Omnicom Indemnification Agreement with respect to his legal fees incurred as a witness in the Omnicom Securities Fraud Class Action.

121.    Neumann was entitled to claim and be reimbursed by Omnicom under the

Omnicom Indemnification Agreement for all legal fees and expenses in the instant action.

122.    However, Neumann has used Seneca funds to pay his legal fees in the current action.

123.    He has done so without independent board approval or review, and solely on the basis of Omnicom's instructions to do so.

124.    Neumann has refused to appoint an independent monitor of the legal fees being paid by Seneca on his behalf to his law firm.

125.    Neumann has refused to provide any information whatever concerning the legal fees being paid by Seneca on his behalf, even in a redacted or summary format.

126.    As alleged, on December 26, 2007, Neumann acknowledged in writing that "Seneca's governing documents mandate a distribution of excess cash annually.

127.    As is now also evident, from at least June of 2007, Neumann and his counsel have been negotiating the $11,000,000 cash Neumann Payment from Omnicom to Neumann.

128.    Neumann has needlessly and wrongfully used Seneca funds for his personal use, despite (i) the availability to him of reimbursement for all legal expenses under the Omnicom Indemnification Agreement, and (ii) his written admission that the Seneca Operating Agreement required him to distribute Seneca's cash.

**H.  Seneca Taxes**

129.    In April of 2004, and with Omnicom's knowledge and approval, Seneca made a distribution of $1,335,000 to PGNT Management LLC ("PGNT"), a company owned by Plaintiff and Neumann, and through which they originally held their shares in Seneca.

130.    Neumann, who was the Chief Financial Officer of both Seneca and of PGNT, recorded this payment as a distribution to shareholders.

131.    The tax firm of Farkouh, Furman & Faccio prepared Seneca's tax returns for the years 2004 and 2005.

132.    All such returns were prepared based on information provided by Neumann as Seneca's Chief Financial Officer, and were approved by Omnicom's tax department before filing with the various tax authorities.

133.    With respect to Seneca 2004 tax return, Neumann confirmed to Farkouh Furman that the $1,335,000 payment from Seneca to PGNT should be classified as a distribution to shareholders.

134.    Farkouh Furman presented drafts of the 2004 tax returns to Omnicom for approval.  These drafts reflected the $1,335,000 payment as a distribution to shareholders.

135.    Omnicom approved those Seneca 2004 tax returns, and they were duly filed by Farkouh Furman on behalf of Seneca.

136.    Similarly, Farhouh Furman prepared and filed, with the approval of Neumann and Omnicom, Seneca's 2005 tax returns.  Seneca's 2005 tax returns continued to reflect the $1,335,000 payment by Seneca to PGNT as a distribution of capital.

137.    In 2007, Neumann unilaterally terminated Seneca's relationship with Farkouh Furman.  He did so without authorization from the Seneca Board of Directors, without consulting with Plaintiff as Seneca's Chief Executive Officer, and without appointing a new tax accountant for Seneca.

138.    Plaintiff repeatedly requested Neumann to authorize the appointment by Seneca of an independent tax advisor, but he refused to do so.

139.    On May 21, 2007, Omnicom suddenly informed Seneca that it intended to reclassify the $1,335,000 payment in April of 2004 from Seneca to PGNT as a "management fee" rather than a distribution of capital.

140.    A distribution of capital is taxed as a capital gain at the capital gains tax rate of 15%, while a "management fee" treatment is taxed as ordinary income at the much higher ordinary income rate.

141.    However, Omnicom received a significant deduction if the $1,335,000 payment was classified as a management fee.

142.    Therefore, the purported reclassification announced by Omnicom in its May 21, 2007 letter was an attempt to benefit Omnicom at the expense of other Seneca shareholders.

143.    On behalf of Seneca, by communications dated May 22 and 24, 2007 to Omnicom and the Seneca Board of Directors, Plaintiff challenged Omnicom's attempted reclassification.

144.    In those communications, Plaintiff pointed out that:

a.    There was no other "management fee" arrangement between Seneca and PGNT other than the March 31, 2004 Management Agreement providing for a management fee to PGNT of $13,500 per month for one year.

b.    Section 2.10 of that Management Agreement provides that it is the sole agreement between the parties with respect to its subject matter.

c.    Seneca did not record any expense item relating to management fees other than the $13,500 per month.

d.    Neumann, as the Chief Financial Officer to both Seneca and PGNT, recorded the $1,335,000 payment as a distribution of capital.

    e.   Neumann and Omnicom thoroughly reviewed and approved the 2004 and 2005 Seneca returns prior to signing them.

    f.   No new information appears to have arisen since the approval by Omnicom and Neumann of the 2004 tax returns as originally approved and filed by Seneca.

145.   Plaintiff also repeatedly requested that Neumann engage an independent tax advisor to provide impartial advice to Seneca and its shareholders.

146.   Neumann, refused to provide any justification for the attempted reclassification by Omnicom of the $1,335,000 payment.

147.   By letter dated September 14, 2007, Omnicom informed Seneca that it, Omnicom, had unilaterally chosen a company called Sauvigne & Partners to amend Seneca's 2004 and 2005 returns, and prepare Seneca's 2006 returns.

148.   On behalf of Seneca, Plaintiff objected to this appointment without the approval by the Seneca board for a number of reasons, including the facts that:

    a.   Omnicom's status as a tax matters partner for Seneca did not give it, under either the tax code or Seneca's constituent documents, the unilateral authority to select the company's tax accountants.

    b.   Such an issue was a matter for Seneca's board of directors.

    c.   The need for board approval was especially important here in light of the substantial issues to be resolved by the board which have tax consequences.

    d.   Omnicom's indication that it will be filing amended 2004 and 2005 returns for Seneca, which returns benefit Omnicom at the expense of other Seneca shareholders.

e.   The appointment related to the proper reflection of capital accounts among the Seneca shareholders in light of the Wharton Transfer.

f.   The appointment related to the proper reflection of funds held by Seneca for distribution to Omnicom, PGNT and/or Wharton.

g.   The appointment related to Omnicom's indemnity liability for legal fees incurred by Seneca in the Omnicom securities fraud class action.

h.   Omnicom had already engaged Mr. Sauvigne on its own behalf on other matters pertaining to Seneca, which strongly suggested a conflict of interest preventing him from representing the interests of all Omnicom shareholders fairly.

i.   The public record reflected a 2003 lawsuit against one Christopher Sauvigne -- perhaps different than the Christopher Sauvigne hired by Omnicom to represent Seneca --  by a former employer for insider dealing and unauthorized use of a corporate credit card.  This at the minimum required Omnicom to inform the Seneca's board of Mr. Sauvigne's background, qualifications, and any possible conflicts.

149.   Despite repeated requests by Plaintiff, Neumann refused to agree to the appointment by Seneca of an independent tax advisor, or take any other action to protect the interests of Seneca shareholders against the attempts by Omnicom to benefit its own tax position to the detriment of other Seneca shareholders.

150.   Plaintiff Neumann accommodated Omnicom's self interested actions because he was at the time secretly negotiating with Omnicom to sell Omnicom his interest in Seneca.

151.   Moreover, Omnicom had secretly agreed to pay for, and in fact did pay

for, all of Neumann's legal fees relating to the negotiation of his Seneca shares.

152.    Neumann was thus receiving a secret and substantial financial benefit from Omnicom at the same time he repeatedly and intentionally refused as a Seneca officer and a director to address several Seneca matters in which Omnicom was benefiting itself, and Neumann, at the expense of Seneca and Plaintiff.

**I.  Vote To Remove Plaintiff As Director and CEO of Seneca**

153.    Under Section 1.6 of the Seneca Operating Agreement, the parties agreed that Plaintiff would be and would remain a Director of Seneca.

154.    In exchange for the clandestine Neumann Payment, Neumann voted to remove Plaintiff as a director and as the Chief Executive Officer of Seneca.

155.    Neumann demanded that he receive the Neumann Payment before providing his votes to remove Plaintiff as a director and officer of Seneca.

156.    Neumann's votes provided in exchange for the Neumann Payment were contrary to the best interests of Seneca and its shareholders, and motivated by personal gain and self-dealing.

**J.    Demand Futility Regarding the Derivative Claims**

157.    The current Seneca board of directors consists of three members, each of whom is a full time Omnicom employee.

158.    As detailed in the foregoing paragraphs, the secret Neumann Payment was made by Omnicom to Neumann, Omnicom has stated its intention to injure Plaintiff because of his filing of the Options Claim, and Omnicom has taken a series of steps since early 2007 to make good on its threat.

159.    Therefore, it is futile for Plaintiff to make a demand of the Seneca Board of Directors that it pursue on behalf of Seneca's shareholders the claims against Neumann detailed herein.

## FIRST CAUSE OF ACTION
### Breach of Contract
### (Failure to Distribute Available Cash)

160.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

161.    Plaintiff entered into the Seneca Operating Agreement (the "Contract"), with the Defendant under which Defendant was required to distribute to the members of Seneca all available cash of Seneca.

162.    Defendant intentionally and in bad faith breached his Contract with Plaintiff.

163.    Plaintiff has at all times fulfilled his obligations under the Contract.

164.    Defendant personally benefited from his breach.

165.    Defendant's breach caused Plaintiff to incur damages in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

## SECOND CAUSE OF ACTION
### Breach of Contract
### (Neumann's Termination of Tierney as Director of Seneca)

166.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

167.    The Seneca Operating Agreement states in Section 1.6 that "The composition of the Board will be as specified on Schedule 1.6."

168.    Schedule 1.6 of the Seneca Operating Agreement listed Plaintiff Michael Tierney as a director.

169.    Section 18 of The Seneca Charter states, "in the event of an inconsistency between this Charter or the Bylaws and the LLC Agreement, the LLC Agreement will prevail.   (The LLC Agreement is referred to herein as the Seneca Operating Agreement).

170.    Neumann breached the Seneca Operating Agreement by executing on or about February 27, 2008 a "Written Consent in Lieu of a Meeting of the Stockholders of Seneca Investments LLC" which acted to terminate and remove Plaintiff Tierney as a director of Seneca.

171.    Defendant explicitly linked his votes to remove Plaintiff as a director of Seneca to Defendant's receipt of the $11,000,000 cash Neumann Payment.

172.    Defendant intentionally and in bad faith breached his Contract with Plaintiff.

173.    Plaintiff has at all times fulfilled his obligations under the Contract.

174.    Defendant personally benefited from his breach.

175.    Defendant's breach caused Plaintiff to incur damages in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

### THIRD CAUSE OF ACTION
**Breach of Contract's Implied Covenant of Good Faith and Fair Dealing
(Refusal to Sell or Distribute Taleo Shares)**

176.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

177.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

178.   Plaintiff entered into the Seneca Operating Agreement (the "Contract"), with the Defendant under which Defendant was under an obligation to act in good faith and deal fairly.

179.   Defendant intentionally and in bad faith violated the covenant of good faith and fair dealing in the Contract by refusing to sell and/or distribute Seneca's Taleo stock to Seneca's members, and/or by utilizing for his personal benefit the Seneca opportunity of selling Taleo shares.

180.   Plaintiff has at all times fulfilled his obligations under the Contract.

181.   Defendant personally benefited from his breach.

182.   Defendant's breach caused Plaintiff to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

### FOURTH CAUSE OF ACTION
### Breach of Contract's Implied Covenant of Good Faith and Fair Dealing
### (Refusal to Sell Seneca's Media Space Investment)

183.   Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

184.   Plaintiff entered into the Seneca Operating Agreement (the "Contract"), with the Defendant under which Defendant was under an obligation to act in good faith and deal fairly.

185.   Defendant intentionally and in bad faith violated the covenant of good faith and fair dealing in the Contract by refusing to sell and/or distribute Seneca's Media Space Investment, and/or by utilizing for his personal benefit the Seneca opportunity to sell its investment in Media Space.

186.    Plaintiff has at all times fulfilled his obligations under the Contract.

187.    Defendant personally benefited from his breach.

188.    Defendant's breach caused Plaintiff to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

## FIFTH CAUSE OF ACTION
### Breach of Contract's Implied Covenant of Good Faith and Fair Dealing
### (Refusal to Collect Securities Class Action Legal Fees Under Omnicom Indemnification Agreement)

189.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

190.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

191.    Plaintiff entered into the Seneca Operating Agreement (the "Contract"), with the Defendant under which Defendant was under an obligation to act in good faith and deal fairly.

192.    Defendant intentionally and in bad faith violated the covenant of good faith and fair dealing in the Contract by refusing to make any effort to obtain from Omnicom class action legal fees for which Omnicom had indemnified Seneca.

193.    Plaintiff has at all times fulfilled his obligations under the Contract.

194.    Defendant personally benefited from his breach.

195.    Defendant's breach caused Plaintiff to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

## SIXTH CAUSE OF ACTION
### Breach of Contract's Implied Covenant of Good Faith and Fair Dealing
### (Refusing to Collect Non Class Action Legal Fees Under the Omnicom Indemnification Agreement)

196.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

197.    Plaintiff entered into the Seneca Operating Agreement (the "Contract"), with the Defendant under which Defendant was under an obligation to act in good faith and deal fairly.

198.    Defendant intentionally and in bad faith violated the covenant of good faith and fair dealing in the Contract by refusing to avail himself of the right to claim reimbursement for legal fees from Omnicom under the Omnicom Indemnification Agreement, and utilizing Seneca funds for such purpose.

199.    Neumann further breached his obligation of good faith and fair dealing by refusing to allow independent monitoring of such legal fees and expenses.

200.    Defendant personally benefited from his breach.

201.    Neumann breaches caused Plaintiff to sustain damages, including punitive damages, in an amount to be proven at trial, but not less than one million dollars ($1,000,000) plus interest.

## SEVENTH CAUSE OF ACTION
### Breach of Contract's Implied Covenant of Good Faith and Fair Dealing
### (Refusing to Oppose Omnicom's Re-Characterization of Certain Distributions as Payments for Services Rather Than Dividends)

202.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

203.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

204.    Plaintiff entered into the Seneca Operating Agreement (the "Contract"), with the Defendant under which Defendant was under an obligation to act in good faith and deal fairly.

205.    Defendant violated the covenant of good faith and fair dealing in the Contract by refusing to investigate and/or oppose Omnicom's re-characterization of certain distributions as payments for services rather than distributions of capital.

206.    Plaintiff has at all times fulfilled his obligations under the Contract.

207.    Defendant personally benefited from his breach.

208.    Defendant's breach caused Plaintiff to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

### EIGHTH CAUSE OF ACTION
**Breach of Contract's Implied Covenant of Good Faith and Fair Dealing
(Intentional and Bad Faith Concealment of Sale of Seneca Ownership to Omnicom
and Negotiations Related to Sale)**

209.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

210.    Plaintiff entered into the Seneca Operating Agreement (the "Contract"), with the Defendant under which Defendant was under an obligation to act in good faith and deal fairly.

211.    Defendant violated the covenant of good faith and fair dealing in the Contract by intentionally and in bad faith concealing his sale of his Seneca ownership to Omnicom and concealing the negotiations of such sale.

30

212.    Plaintiff has at all times fulfilled his obligations under the Contract.

213.    Defendant personally benefited from his breach.

214.    Defendant's breach caused Plaintiff to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

## NINTH CAUSE OF ACTION
### (Breach of Fiduciary Duty- Direct and Derivative Action Refusal to Sell or Distribute Taleo Shares)

215.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

216.    Plaintiff was a director of Seneca who owed a fiduciary duty to Plaintiff and Seneca.

217.    Defendant intentionally and in bad faith breached his fiduciary duties of care, loyalty, candor and disclosure by refusing to sell and/or distribute Seneca's Taleo stock to Seneca's members, and/or by utilizing for his personal benefit the Seneca opportunity of selling Taleo shares and by concealing material facts from Plaintiff.

218.    Defendant personally benefited from his breach of fiduciary duties.

219.    Defendant's breaches caused Plaintiff and Seneca to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

## TENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty- Direct and Derivative Action Refusal to Sell Seneca's Media Space Investment)

220.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

221.     Plaintiff was a director of Seneca who owed a fiduciary duty to Plaintiff and Seneca.

222.     Defendant intentionally and in bad faith breached his fiduciary duties of care, loyalty, candor and disclosure by refusing to sell and/or distribute Seneca's Media Space Investment, and/or by utilizing for his personal benefit the Seneca opportunity of selling the Media Space investment and by concealing material facts from Plaintiff.

223.     Defendant personally benefited from his breach of fiduciary duties.

**224.**     Defendant's breaches caused Plaintiff and Seneca to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.


## ELEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty- Direct and Derivative Action
### Refusal to Collect Securities Class Action Legal Fees Under Omnicom
### Indemnification Agreement)

225.     Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

226.     Plaintiff was a director of Seneca who owed a fiduciary duty to Plaintiff and Seneca.

227.     Defendant intentionally and in bad faith breached his fiduciary duties of care, loyalty, candor and disclosure by refusing to make any effort to obtain from Omnicom class action legal fees for which Omnicom had indemnified Seneca and by concealing material facts from Plaintiff.

228.     Defendant personally benefited from his breach of fiduciary duties.

**229.**    Defendant's breaches caused Plaintiff and Seneca to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.


## TWELFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty- Direct and Derivative Action
### Refusing to Collect Non Class Action Legal Fees Under the Omnicom
### Indemnification Agreement)

230.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

231.    Plaintiff was a director of Seneca who owed a fiduciary duty to Plaintiff and Seneca.

232.    Defendant intentionally and in bad faith breached his fiduciary duties of care, loyalty, candor and disclosure by refusing to avail himself of the right to claim reimbursement for legal fees from Omnicom under the Omnicom Indemnification Agreement, and utilizing Seneca funds for such purpose and by concealing material facts from Plaintiff.

233.    Defendant personally benefited from his breach of fiduciary duties.

**234.**    Defendant's breaches caused Plaintiff and Seneca to incur damages, , including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.


## THIRTEENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty-Direct and Derivative Action
### (Refusing to Oppose Omnicom's Re-Characterization of Certain Distributions as
### Payments for Services Rather Than Dividends)

235.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

236.    Plaintiff was a director of Seneca who owed a fiduciary duty to Plaintiff and Seneca.

237.    Defendant intentionally and in bad faith breached his fiduciary duties of care, loyalty, candor and disclosure by refusing to investigate and/or oppose Omnicom's re-characterization of certain distributions as payments for services rather than capital distributions and by concealing material facts from Plaintiff.

238.    Defendant personally benefited from his breach of fiduciary duties.

**239.**    Defendant's breaches caused Plaintiff and Seneca to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

## FOURTEENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty-Direct and Derivative Action
### (Intentional and Bad Faith Concealment of Sale of Seneca Ownership to Omnicom and Negotiations Related to Sale)

240.    Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

241.    Plaintiff was a director of Seneca who owed a fiduciary duty to Plaintiff and Seneca.

242.    Defendant intentionally and in bad faith breached his fiduciary duties of care, loyalty, candor and disclosure by intentionally and in bad faith concealing his sale of his Seneca ownership to Omnicom and concealing the negotiations of such sale.

243.    Defendant personally benefited from his breach of fiduciary duties.

**244.**    Defendant's breaches caused Plaintiff and Seneca to incur damages, including punitive damages, in an amount to be determined at trial but no less than one million dollars ($1,000,000) plus interest.

### FIFTEENTH CAUSE OF ACTION
### Conversion-Direct and Derivative Action

245.    Plaintiff repeats and realleges each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

246.    Defendant intentionally and illegally interfered with Plaintiff's interest in the cash of Seneca.

247.    Defendant specifically interfered, *inter alia*, with Plaintiff's and Seneca's right to the cash of Seneca.

248.    Defendant's interference caused Plaintiff and Seneca to suffer material damages.

249.    Accordingly, Plaintiff seeks and is entitled to damages, including punitive damages, in an amount to be determined at trial that is no less than one million dollars ($1,000,000) plus interest.

### SIXTEENTH CAUSE OF ACTION
### Unjust Enrichment-Direct and Derivative Action

250.    Plaintiff repeats and realleges each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

251.    Defendant has been unjustly enriched by his own intentional acts committed in bad faith.

252.    Defendant's expense has been at the expense of Plaintiff and Seneca.

253. Accordingly, Plaintiff seeks and is entitled to damages, including punitive damages, in an amount to be determined at trial that is no less than one million dollars ($1,000,000) plus interest.

## SEVENTEENTH CAUSE OF ACTION
### Illegal Distribution Violating Delaware Corporate Law including 8 Del. C. Section 174 - Direct and Derivative Action

254. Plaintiff repeats and realleges each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

255. Defendant has intentionally and in bad faith made improper distributions from Seneca in violation of Delaware Corporate Law including 8 Del. C. Section 174

256. Defendant's improper and illegal distributions from Seneca were for his own personal benefit.

257. Defendant's improper and illegal distributions from Seneca have been at the expense of Plaintiff and Seneca.

258. Accordingly, Plaintiff seeks and is entitled to damages, including punitive damages, in an amount to be determined at trial that is no less than one million dollars ($1,000,000) plus interest.

WHEREFORE, Plaintiffs pray that this Court:

1. Grant judgment against Defendant and in favor of Plaintiff in an amount to be determined at trial, not less than ten million dollars ($10,000,000) plus interest, and additional punitive damages in an amount to be determined at trial not less than five million dollars ($5,000,000);

2. Award Plaintiffs the costs and disbursements of prosecuting this action, including reasonable attorneys' fees; and

4. Order such other and further relief as this Court deems just and proper.

Dated: New York, New York
       September 4, 2008

                              LAW OFFICE OF WILLIAM COUDERT RAND

                              s/ William C. Rand
                              _____
                              William C. Rand, Esq.
                              711 Third Ave., Suite 1505
                              New York, New York 10017
                              Phone: (212) 286-1425; fax: 212-599-7909
                              Attorneys for Plaintiff Michael P. Plaintiff